## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

FIRST INSURANCE FUNDING, a Division of Lake Forest Bank & Trust Co., N.A.,

                    Plaintiff,

v.                                                  Case No. 8:22-cv-01975-WFJ-AAS

STONEMARK, INC., a corporation, and JERRY SMITH, an individual,

                    Defendants.

---

## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

Plaintiff FIRST Insurance Funding, a Division of Lake Forest Bank & Trust Co., N.A. ("FIRST"), pursuant to Federal Rule of Civil Procedure 65 and Local Rule 6.02, moves for a preliminary injunction against Defendant Jerry Smith, its former employee. Smith downloaded FIRST's trade secrets, resigned his employment, and immediately took an identical position with FIRST's competitor, Defendant Stonemark, Inc. FIRST seeks to prevent Smith from disclosing its trade secrets to Stonemark and using them to compete against FIRST, and requests that the Court direct Smith to allow forensic examination of his accounts and devices.

In support of this motion, FIRST submits the attached memorandum of law. For the reasons discussed therein, the Court should grant FIRST's motion and issue the preliminary injunctive relief requested below.

<u>**MEMORANDUM OF LAW**</u>

**FACTUAL BASIS FOR THE MOTION**

The facts underlying this Motion are set forth in detail in FIRST's complaint and the affidavits filed herewith and cited herein.

## I.     FIRST's Business, Trade Secrets, and Relevant Policies.

Plaintiff FIRST is a leading provider of premium finance loans to businesses and consumers across the United States and Canada. (Doc. 1, Compl., ¶¶ 16–17; Ex. 1, Miller Aff., ¶ 3.) Specifically, FIRST provides short-term financing to facilitate the purchase of property and casualty insurance coverage, primarily to small businesses and entrepreneurs who need coverage but cannot afford the upfront expense, lack access to traditional sources of credit, or must finance such purchases to better manage cash flow. (Ex. 1 at ¶ 3.) FIRST is a part of Lake Forest Bank & Trust Co., N.A. and was a subsidiary of Wintrust Financial Corp. (Compl. ¶ 18; Ex. 1. ¶¶ 5–6.)

Premium finance lenders like FIRST form business relationships with insurance brokers and agents. (Ex. 1 at ¶ 4.) If businesses purchasing insurance policies from these brokers and agents need financing to obtain sufficient coverage, then the brokers and agents will arrange loans through their premium finance lender relationships. (*Id.*)

To effectively compete in the marketplace, FIRST uses information, technology, software, and hardware that it has developed through substantial investments of time, money, and resources. (Compl. ¶¶ 19–20; Ex. 1 ¶ 7.) These include "FIRST Insite" (a loan system); the "Seismic" software platform (a document management

system containing, among other things, product demo and training videos); e-signature software; "e-Complete" software and related documents and videos; exclusive training and sales coaching materials; "JumpStart" sales videos (which contain exclusive sales coaching); documents detailing financial activities of FIRST and/or its customers; documents detailing commercial loan interest rates and terms; documents detailing information related to insurance agencies and insurance agency associations; and documents detailing all commercial loans booked by FIRST for all insurance agencies and brokers. (*Id.*)

This information is incredibly valuable to FIRST. Premium finance lenders often compete on the speed and ease of doing business. (Ex. 1 ¶ 8.) Insurance brokers and agents often expect that their insureds' loans can be submitted, booked, and funded on the same business day. (*Id.*) FIRST developed its e-Complete loan product to provide a fast, paperless option for brokers and agents to arrange financing online. (*Id.*) The multimillion dollar investment in the e-Complete technology resulted in a key differentiator for FIRST in the premium finance marketplace.

Premium finance lenders also compete on loan terms and interest rates. (*Id.* ¶ 9.) To enable a speedy loan process, FIRST preapproves terms and rates for the majority of loans it receives from brokers and agents. FIRST spends significant time and effort learning about the brokers' and agents' insurance company relationships and clientele businesses to establish terms and rates (called "pricing programs") that accurately reflect the credit risk of the portfolio. (*Id.*) Throughout its relationship with brokers and

agents, FIRST will adjust pricing programs to maintain competiveness, reflect increasing or decreasing delinquency, and drive revenue to brokers and agents where permitted by applicable state law. (*Id.*)

FIRST takes several steps to keep these materials secret from its competitors and the general public. For starters, employees are granted access to certain materials only on a need-to-know basis; typically, they can access only those materials they need to assist them in performing their job duties. (Compl. ¶¶ 28, 31; Ex. 1 ¶ 11.) A valid username and password is also required to access them. (Compl. ¶ 30; Ex. 1 ¶ 11.) And FIRST regularly shares certain video materials that it considers secret with employees via livestream, so employees can view the videos but cannot download or save them. (Compl. ¶ 29; Ex. 1 ¶ 11.)

Company policies govern employees' use of FIRST's confidential business information and materials. First, the employee handbook contains a strict "Confidentiality Policy" that prohibits use and disclosure of "confidential or proprietary Company or non-public personal customer or team member information in any form at any time." (Compl. ¶ 21.) The policy defines these terms at length and instructs employees to "never reveal or give out this type of confidential Company information in any form" and to only "create, store, or transmit business records or engage in written communications solely and exclusively through Company systems." (*Id.*) It also warns that "[s]haring this type of information, even unintentionally, can potentially result in harm to the individual, harm to the Company's business, and ultimately you and/or Company being sued by an individual, other businesses or the government." (*Id.*)

4

FIRST also maintains a separate "Security Policy" that defines confidential information as "information that, if disclosed, could reduce the Company's competitive advantage, or cause significant damage to the Company" and specifies that "the unauthorized disclosure, modification, or destruction of this information would adversely impact the Company or subject it to legal action and penalties. This information is intended for use only within the Company." (Compl. ¶¶ 22–25; Ex. 1 ¶ 10.) The Security Policy also prohibits use of "third party services which are not under contract with Wintrust to transmit, store, or synchronize information assets." (Compl. ¶ 26; Ex. 1 ¶ 10.)

When an individual's employment with FIRST ends for any reason, FIRST immediately terminates the employee's access to its facilities, systems, and data storage, and requires that the employee return all company-owned property in their possession, including documents, files, electronic devices, and data stored on them. (Compl. ¶ 32.)

## II.   Smith's Employment with FIRST, Misconduct, and Departure.

Jerry Smith worked for FIRST from 2011 to 2022, first as a Regional Vice President of Sales and, eventually, as an Executive Vice President of Sales. (Compl. ¶ 33; Ex. 1 ¶¶ 12–13.) These were both high-level positions. Smith's job duties as a Regional Vice President of Sales included servicing an assigned area of focus in Florida, where he worked with valuable customers and relationships of FIRST, selling FIRST's products and services to such individuals and entities, and providing guidance regarding these products and services specific to the financial decisions and needs of FIRST's customers. (Compl. ¶ 33; Ex. 1 ¶ 12.) Smith was thus a key and trusted employee of

FIRST. (Compl. ¶ 36; Ex. 1 ¶ 13.)

During his employment, FIRST granted Smith access to its trade secrets to assist him in performing his important job duties. (Compl. ¶¶ 34–37; Ex. 1 ¶ 14.) These included the Seismic software, FIRST's document storage system through which it maintains many of its trade secrets. Seismic hosts, among other trade secrets, documents, videos, and other information relating to FIRST's proprietary e-Complete product. (Compl. ¶ 37; Ex. 1 ¶ 14.) Beyond that, given the high level of his positions and the trust placed in him, Smith contributed to the development and compilation of additional trade secrets for FIRST. (Compl. ¶ 38.) While employed by FIRST, Smith was required to complete training on the Security Policy. (*Id.* ¶ 27; Ex. 1 ¶ 10.)

Smith resigned his employment with FIRST on May 27, 2022. (Compl. ¶ 39; Ex. 1 ¶ 15.) Immediately afterward, Smith began working for Stonemark. (Compl. ¶ 40; Ex. 1 ¶ 16; Ex. 3.) FIRST has a good-faith basis to believe that Smith's position, duties, and region are identical to those of his job with FIRST. (Compl. ¶¶ 41–44; Ex. 1 ¶ 16; Ex. 3 at 1.) Upon learning that Smith had begun working for Stonemark, FIRST immediately began to examine Smith's work devices and investigate his actions as they relate to FIRST's trade secrets. (Compl. ¶ 45; Ex. 1 ¶ 17, 18.) FIRST also demanded that Smith return his company-issued laptop; he eventually did so after the demand. (Compl. ¶ 46, 47; Ex. 1 ¶ 17.) FIRST's forensic investigation of Smith's work accounts (including email) and the electronic devices he used revealed the following:

In April 2022, Smith began exploring employment opportunities with Defendant Stonemark—using his FIRST work computer. (Compl. ¶ 52; Ex. 1 ¶ 19; Ex. 2,

Swaminathan Aff., ¶ 23.) Stonemark is a finance company specializing in providing financing services for properties, brokers, and borrowers/insureds. (Compl. ¶¶ 41–42; Ex. 1 ¶ 16.) It regularly and directly competes with FIRST in the premium finance lending marketplace. (*Id.*)

Soon after starting these talks with Stonemark, Smith began to systematically download documents and excel spreadsheets containing confidential information about FIRST's customers and financial activities. (Compl. ¶ 50; Ex. 1 ¶ 19; Ex. 2 ¶¶ 7–21.) He then forwarded these documents from his FIRST email account (jerry.smith@firstinsurancefunding.com) to a personal email address (jsmith771013@gmail.com). (Compl. ¶ 57; Ex. 1 ¶¶ 19, 20; Ex. 2 ¶¶ 7–20, Ex. B.) They included:

- Detailed information about the commercial loan interest rates and terms (down payment amount and number of installment payments) underwritten and approved by FIRST for use by *every single* insurance agency and broker in Mr. Smith's portfolio, including historical information on commercial loan interest rates and amount financed volume sorted by commercial loan amount tiers;

- Detailed information about *every single* insurance agency member of the Florida Association of Independent Agents, including members' business addresses and individual business contact information, the insurance agencies' Errors and Omissions policy premium amounts and whether the members financed the premiums, and information about the Florida Association of Independent Agents' dues structure; and

- Detailed information about *every single* commercial loan booked by FIRST in the trailing twelve months for *every single* insurance agency and broker in Smith's portfolio, including the insured business name, down payment amount, amount financed, loan interest rate and corresponding finance charge amount, number of payments, and whether the agent or broker received compensation for arranging the financing and the amount of such compensation as applicable.

(Compl. ¶¶ 53–55; Ex. 1 ¶¶ 20, 22; Ex. 2 ¶¶ 8–20, Ex. B.) Smith had no legitimate reason related to his job duties to suddenly download and forward himself all of this

information. (Compl. ¶¶ 51, 61, 63; Ex. 1 ¶ 20.) In fact, this conduct violated the Security Policy, which prohibits storing FIRST's confidential information on any data system not maintained by FIRST itself. (Compl. ¶¶ 24–26; Ex. 1 ¶ 10.)

Then, on May 5, 2022, Smith deleted folders and accompanying information from his work email account, which FIRST has reason to believe further evidenced his stealing of its trade secrets. (Compl. ¶ 56; Ex. 1 ¶ 21; Ex. 2 ¶ 22.) On May 24, Smith forwarded to his personal email account a document that discussed commission rates and additional confidential information relating to specific customers of FIRST. (Ex. 1 ¶ 22; Ex. 2 ¶¶ 18-19.) On May 26, *the day before he resigned*, Smith accessed, downloaded, and forwarded to himself confidential, proprietary demo videos, decks and training materials regarding "Jumpstart" videos, FIRST's "COVID-19 Premium Finance Toolkit," and "FlexPay-Payment Tools" for Workers Compensation Insurance. (Compl. ¶ 58; Ex. 1 ¶ 22.) FIRST's investigation has not produced any legitimate work emails related to these downloads. (Compl. ¶¶ 61–62.) Smith also engaged in substantial activity on Seismic on his last day of work, accessing, downloading, and/or sending fourteen items containing FIRST's trade secrets, none of which was related to or necessary for Smith's performance of his job duties for FIRST. (Compl. ¶ 60; Ex. 2 ¶ 24.) This was after eight months of Smith not accessing Seismic once. (*Id.*)

When FIRST began to uncover evidence of Smith's wrongdoing, it sent cease-and-desist letters to Smith and Stonemark demanding they immediately stop using FIRST's trade secrets, return (and not destroy) the trade secrets, and stop interfering with FIRST's contracts and its relationships with its actual and prospective customers.

(Compl. ¶¶ 64–66; Ex. 1 ¶ 23.) Smith's response failed to provide credible answers or assurances requested in response to FIRST's misappropriation concerns. (Compl. ¶ 67; Ex. 1 ¶ 26.) Meanwhile, Stonemark's response admitted that Smith had accessed this information, but failed to provide a satisfactory reason for possessing those documents and refused to meet FIRST's demands for assurances. (Compl. ¶ 68.) FIRST now brings claims of misappropriation of trade secrets against Smith (and Stonemark) under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq., and the Florida Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. § 688.001 et seq.[1] (*Id.* at 17–18.)

## LEGAL STANDARD

To obtain equitable relief through a preliminary injunction, a plaintiff must show (1) a substantial likelihood of success on the merits; (2) irreparable harm; (3) that the threatened harm to the plaintiff outweighs the potential damage to the defendant; and (4) that an injunction would not be adverse to the public interest. *Larweth v. Magellan Health, Inc.*, 841 F. App'x 146, 152 (11th Cir. 2021).

## ARGUMENT

### I.    Plaintiff Will Likely Prevail on Its Claims.

"A likelihood of success on the merits is generally the most important factor when considering whether to grant a motion for preliminary injunction." *Int'l Hair & Beauty Sys., LLC v. Simply Organic, Inc.*, No. 8:11-CV-1883-30AEP, 2011 WL 5359264,

---

[1] FIRST also brings a claim against Smith for breach of fiduciary duty. (Compl at 20.) While FIRST does not request injunctive relief on the basis of this claim, some facts underlying the claim overlap with or bolster the trade secret misappropriation claims and highlight the need for injunctive relief here to immediately stop Smith from continuing to irreparably injure FIRST.

at *9 (M.D. Fla. Sept. 26, 2011) (report and recommendation), *adopted as modified*, 2011 WL 5360098 (M.D. Fla. Nov. 3, 2011). To satisfy this requirement, a plaintiff must show "only likely, rather than certain, success." *Id.* (cleaned up). "[W]here the balance of the equities weighs heavily in favor of granting the injunction, the movant need only show a substantial case on the merits." *Id.* (cleaned up).

Both DTSA and FUTSA authorize a court to grant an injunction to prevent "actual" or "threatened" misappropriation of a "trade secret."[2] 18 U.S.C. § 1836(b)(3)(A)(i); Fla. Stat. § 688.003(1); *see Hatfield v. Autonation, Inc.*, 939 So. 2d 155, 157 (Fla. Dist. Ct. App. 2006) (noting an injunction with respect to stolen business secrets is authorized where it will eliminate commercial advantage derived from the misappropriation of trade secrets). To prevail on a claim under FUTSA, Plaintiff must show (1) that it possesses "secret information and took reasonable steps to protect its secrecy," and (2) "the secret it possessed was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it." *New Country Motor Cars of Palm Beach, LLC v. Beresford*, No. 17-80856-CIV, 2019 WL 3890456, at *6 (S.D. Fla. May 3, 2019); *see Del Monte Fresh Prod. Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001).

---

[2] "DTSA creates a federal cause of action that largely mirrors FUTSA. Indeed, DTSA's definitions of 'misappropriation' and 'improper means' are largely identical to" FUTSA's. *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1317 n.13. (11th Cir. 2020) (citation omitted). And "[t]he definition of 'trade secret,' while not identical to FUTSA's definition, is substantially equivalent." *Id.* (citing 18 U.S.C. § 1839(3)). Additionally, "the substantive standard for misappropriation is identical under FUTSA and DTSA, at least as they apply here." *Id.* Thus, FIRST does not "undertake a separate analysis of [its] DTSA claim" in this brief. *Id.*

### A.   Plaintiff's information qualifies as trade secrets.

A "trade secret"—broadly defined under both DTSA and FUTSA—means information that (1) "derives economic value from not being readily ascertainable by others and (2) is the subject of reasonable efforts to maintain its secrecy." *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998) (citing Fla. Stat. § 688.002(4)). FIRST's information at issue meets both elements.

### 1.   Economic value stemming from the information's secrecy.

To begin, the trade secrets at issue here fall into the following categories: (1) confidential documents concerning FIRST's customers; (2) confidential documents concerning FIRST's business strategies and operations; (3) FIRST's proprietary software, including Seismic and e-Complete; and (4) training and sales videos from Jumpstart. (Compl. ¶¶ 19–20; Ex. 1 ¶ 7.) This trade-secret information is extremely valuable and crucial to FIRST and FIRST has invested substantial resources into its development; as a result, it provides FIRST with a competitive advantage in the industry. (*Id.*) Were a competitor to gain access to this trade-secret information, it would gain a competitive advantage over FIRST because it could pursue the same business opportunities at a lower cost, i.e., without having to invest in the development of the trade-secret information. *See Watts v. Metro. Life Ins. Co.*, No. 09-CV-829 WQH (WVG), 2010 WL 11508844, at *3 (S.D. Cal. Oct. 7, 2010) ("[T]rade secret information . . . could be used by business competitors to circumvent the considerable time and resources necessary to develop [them].")

Caselaw establishes that the information Smith stole from FIRST qualifies as

trade secrets. First, "Florida law considers a business's customer lists and the information contained therein to be trade secrets subject to protection if that information is compiled from non-public information and is kept confidential by the business." *JetSmarter Inc. v. Benson*, No. 17-62541-CIV, 2018 WL 2709864, at *4 (S.D. Fla. Apr. 6, 2018) (report and recommendation) (collecting cases), *adopted*, 2018 WL 2688774 (S.D. Fla. Apr. 26, 2018). The lists here contain information detailing customers' financial activities, their contact information, and "additional confidential information relating to specific customers of FIRST." (Compl. ¶¶ 19, 53–55, 57; Ex. 1 ¶¶ 19, 20.)

This goes well beyond basic information that is available from publicly accessible sources. "[U]nder Florida law, a trade secret 'includes a unique combination of otherwise known components, if the combination differs materially from other methods known in the trade.'" *Sexual MD Sols., LLC v. Wolff*, No. 20-20824-CIV, 2020 WL 2197868, at *14 (S.D. Fla. May 6, 2020) (quoting *Sun Crete of Fla., Inc. v. Sundeck Prod., Inc.*, 452 So. 2d 973, 975 (Fla. Dist. Ct. App. 1984)). "Thus, even if the bases for the information is publicly available from other sources, a unique compilation of that information specifically tailored to a particular market may qualify as a trade secret." *Id.*

FIRST has internally compiled and organized this information about its own interactions with its customers over many years to ensure it can effectively provide services to them and market additional products and services. (*See* Compl. ¶ 20; Ex. 1 ¶ 7.) "Here, given the manner in which Plaintiff's lists were reportedly compiled, the content of those lists, the restricted access to those lists, and the measures taken for their safekeeping [discussed below], Plaintiff's Customer List would qualify as a trade

12

secret under Florida law." *JetSmarter*, 2018 WL 2709864, at *4; *see AutoNation, Inc. v. Mulleavey,* 19-60833-CIV, 2019 WL 4693575, at *3 (S.D. Fla. Aug. 22, 2019) (stating that customer lists, especially those with specific details, are considered trade secrets); *Hayes Healthcare Servs., LLC v. Meacham*, 19-60113-CIV, 2019 WL 2637053, at *1 (S.D. Fla. Feb. 1, 2019); *Pinch A Penny, Inc. v. SR & JG, Inc.*, 9:15-CV-80067, 2017 WL 5763118, at *9 (S.D. Fla. Sept. 19, 2017). These "lists with sensitive client information and preferences are 'highly valuable.'" *Freedom Med., Inc. v. Sewpersaud*, 469 F. Supp. 3d 1269, 1275 (M.D. Fla. 2020) (citation omitted), *order clarified*, No. 6:20-CV-771-ORL-37GJK, 2020 WL 3487642 (M.D. Fla. June 25, 2020).

FIRST's confidential information about its own business strategies, finances, and pricing, and sales also qualifies as trade secrets. Like its customer information, FIRST has devoted substantial time and resources into refining its internal strategies for marketing its products and services to prospective customers and then effectively and efficiently providing those products and services to actual customers. (Compl. ¶ 20; Ex. 1 ¶ 7.) FIRST keeps this information confidential and it provides FIRST with a competitive edge over its competitors. *See Quality Lab. Mgmt., LLC v. Galvan*, No. 6:21-CV-588, 2021 WL 4935745, at *2 (M.D. Fla. July 12, 2021) ("Quality Labor's client lists, employee lists, and other *confidential and proprietary business strategies* constitute trade secrets under . . . the DTSA and the FUTSA." (emphasis added)); *Freedom Med.*, 469 F. Supp. 3d at 1275 (holding that the plaintiff's "business information and marketing strategies, which help it maintain its competitive position in the healthcare industry," were trade secrets).

The third and fourth categories qualify as trade secrets because they contain protected information discussed above: confidential, valuable information concerning FIRST's customers and business strategies. The "training videos" and "training courses" at issue here qualify because they discuss FIRST's business and sales strategies developed in secret over many years. (*See* Compl. ¶ 19; Ex. 1 ¶ 7); *see Sexual MD*, 2020 WL 2197868, at *14. Thus, they "have economic value beyond the basic marketing principles and techniques derived from third-party sources." *Id.* at *15.

FIRST's proprietary software consists of its Seismic and FIRST Insite databases, e-signature software, and "e-Complete" proprietary loan product. (*Id.*) Seismic and FIRST Insite house the confidential information discussed above. The e-signature and e-Complete software qualify as trade secrets because their "features are unique and not well-known or available in the market." *Mapei Corp. v. J.M. Field Mktg., Inc*, 295 So. 3d 1193, 1198 (Fla. Dist. Ct. App. 2020). FIRST has developed this software itself and in secret; it does not make the software available to third parties or even its customers. (*See* Compl. ¶ 20; Ex. 1 ¶ 7.) FIRST derives value from this software because it allows FIRST to more effectively compete in the marketplace. (*Id.*)

## 2. Plaintiff's reasonable efforts to safeguard its information.

A plaintiff's "efforts to maintain secrecy need not be overly extravagant, and absolute secrecy is not required." *Int'l Mkts. Live, Inc. v. Huss*, No. 20-23080-CIV, 2020 WL 9219150, at *19 (S.D. Fla. Nov. 25, 2020) (report and recommendation) (cleaned up), *adopted*, 2021 WL 870535 (S.D. Fla. Mar. 9, 2021). Rather, the critical question is whether "an entity [has] take[n] reasonable measures to protect its secrets." *Id.*

As discussed above, FIRST protects its information by, among other things, (1) requiring username and password credentials to access them, (2) maintaining and circulating a confidentiality policy in its employee handbook prohibiting employees from improperly using or disseminating the information, (3) requiring that employees train on its similar "Security Policy," (4) only disclosing the information to certain employees who need access to it to perform their job duties, and (5) upon receiving notice of the termination of their employment, cutting off former employees' access to its facilities, systems, and data storage and requiring that they return any information in their possession. (Compl. ¶¶ 20–32; Ex. 1 ¶¶ 10, 11.) These all qualify as reasonable efforts to maintain secrecy under FUTSA.[3]

## B.   Defendant Smith misappropriated Plaintiff's trade secrets.

One can misappropriate a trade secret by "acquisition," "disclosure," or "use." *See* Fla. Stat. § 688.002(2). A person misappropriates a trade secret by acquisition when he acquires it and "knows or has reason to know that the trade secret was acquired by improper means." *Id.* § 688.002(2)(a). A person misappropriates a secret by disclosure

---

[3] *See Serrala US Corp. v. Paschke*, No. 3:21CV907-TKW-EMT, 2022 WL 2234971, at *4 (N.D. Fla. May 16, 2022) ("Plaintiff takes numerous measures to guard the confidentiality of the solutions, including . . . using password protected access to the systems used for development and distributions of the solutions. "); *Scanz Techs., Inc. v. JewMon Enters., LLC*, No. 20-22957-CIV, 2021 WL 65466, at *7 (S.D. Fla. Jan. 7, 2021) ("[U]pon termination JewMon had to return or destroy all proprietary information it received during the course of its relationship with Scanz. . . . [T]he complaint [thus] sets forth numerous ways the Plaintiff attempted to safeguard and keep secret its proprietary information."); *Seacoast Banking Corp. of Fla. v. Diemer*, No. 6:20-CV-57-ORL-37LRH, 2020 WL 3266107, at *2 (M.D. Fla. Feb. 3, 2020) ("Seacoast took reasonable efforts to protect this information [including] by limiting access to employees on a need-to-know basis[.]"), *amended*, 2020 WL 1674314 (M.D. Fla. Mar. 4, 2020); *Ingenix, Inc. v. Gardner*, No. 05-80474-CIV, 2005 WL 8156831, at *2 (S.D. Fla. Nov. 4, 2005) ("[T]he complaint alleges that Ingenix's trade secrets are subject to reasonable efforts to keep them secret, such as giving each employee a policy handbook which prohibits disclosure or use of trade secret information.").

or use if he uses or discloses it "without express or implied consent" and either:

1.  Used improper means to acquire knowledge of the trade secret; or

2.  At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:

    a.  Derived from or through a person who had utilized improper means to acquire it;

    b.  Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

    c.  Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

Fla. Stat. § 688.002(2)(b). "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 688.002(1); *cf.* 18 U.S.C. § 1839(5), (6). "Actions may be 'improper' for trade-secret purposes even if not independently unlawful." *Compulife*, 959 F.3d at 1312. Additionally, Florida courts recognize that "direct evidence of misappropriation is difficult to prove in trade secret cases and can be based on circumstantial evidence." *Mapei*, 295 So. 3d at 1199 (citing *Stratienko v. Cordis Corp.*, 429 F.3d 592, 600–01 (6th Cir. 2005)).

### 1.   Acquisition

"Florida law imposes upon every employee a duty not to use the employer's trade secrets for his own benefit, if the secret was acquired by the employee in the course of his employment." *Se. Mech. Servs., Inc. v. Brody*, No. 8:08-CV-1151-T-30EAJ, 2008 WL 4613046, at *10 (M.D. Fla. Oct. 15, 2008). This common-law duty applies regardless of whether a written agreement not to disclose trade secrets existed. *Id.* at

n.17; *see Fortiline, Inc. v. Moody*, No. 12-CV-81271, 2013 WL 12101142, at *4 (S.D. Fla. Jan. 7, 2013) (discussing employees' "common law duty not to engage in disloyal acts in anticipation of future competition . . . includ[ing] using confidential information acquired during the course of his employment" (cleaned up)). Smith downloaded and forwarded to himself FIRST's trade secrets while he was still employed by FIRST and had access to its data systems. Thus, his actions constitute a "breach of a duty to maintain secrecy" of FIRST's trade secrets. Fla. Stat. § 688.002(1).

Beyond that, Smith knew of his own breach of this duty because FIRST placed him on notice that his conduct was not allowed under its policies. *See id.* § 688.002(2)(a). The Security and Confidentiality Policies that FIRST shared with Smith made clear that he was not permitted to store its trade secrets on any data platform not owned and controlled by FIRST or retain possession of those trade secrets after his employment ended (Compl. ¶¶ 21–27; Ex. 1 ¶ 10.) Smith did so anyway. He thus "acquired" FIRST's trade secrets using "improper means." Fla. Stat. § 688.002(1); *see Fortiline*, 2013 WL 12101142, at *4 ("[T]his is . . . an instance of actively obtaining trade secrets through improper means, specifically, the downloading of customer data in contravention of Fortiline's rules and policies to benefit AVEM in competing directly against Fortiline.").

### 2.   Threatened use and disclosure

FIRST also has evidence of Smith's threatened use and disclosure of its trade secrets now that Smith is in Stonemark's employ. The facts here are substantially sim-

ilar to *Aquent LLC v. Stapleton*, in which another division of this Court granted a pre-liminary injunction against the plaintiff's former vice president who quit and immediately went to work for a competitor. No. 6:13-cv-1889-Orl-28DAB, 2014 WL 117095, at *1 (Jan. 13, 2014). There, the employee "downloaded vast amounts of information from its database while she was still employed at Aquent for use at" her new employer. *Id.* And the employee "admit[ted] that she downloaded some information that constitutes a trade secret." *Id.* at *2. The court rejected the employee's argument that Aquent failed to show misappropriation:

> Aquent has submitted declarations indicating that its information has been accessed from iTalent computers. In addition, Ms. Stapleton has admitted to spoliation of the evidence. In response to Aquent's demand that information be returned, Ms. Stapleton directed her husband to destroy the four thumb drives containing the requested data. The Court infers from this spoliation that actual or threatened misappropriation occurred. § 688.003(1), Fla. Stat. (2013) ("Actual or threatened misappropriation may be enjoined."). Aquent has thus shown that it has a substantial likelihood of success on the merits of its FUTSA claim.

*Id.* at *3 (record citations omitted).

Here, forensic evidence shows that Smith repeatedly downloaded trade-secreted information and documents in the weeks and days before he left to compete against FIRST. Stonemark has even admitted that Smith possesses FIRST's confidential documents. (Compl. ¶ 68.) And Smith, like the defendants in *Aquent*, destroyed evidence that he stole protected information. (Compl. ¶ 56; Ex. 1 ¶ 21.) There is no conceivable purpose for Smith to have taken these documents and information with him to Stonemark unless he planned to use them to compete against FIRST—something his new position at Stonemark perfectly poises him to do. The facts here justify the same

18

remedy imposed in *Aquent*: a preliminary injunction. *See* 2014 WL 117095, at *4; *All Leisure Holidays Ltd. v. Novello*, No. 12-cv-52328, 2012 WL 5932365, at *5 (S.D. Fla. Nov. 27, 2012) (entering TRO against former employee for misappropriating trade secrets); *VAS Aero Servs., LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1364 (S.D. Fla. 2012) (granting preliminary injunction against former employee who worked for a competitor and misappropriated key customer and financial information trade secrets).

To summarize, Smith began discussions with a direct competitor to come work for it, then started collecting FIRST's trade secrets—including data he had no legitimate business need to access. Then Smith deleted evidence of this to cover his tracks and downloaded more trade secrets the day before he resigned from FIRST. After resigning, Smith immediately began working for Stonemark in the exact same position, location, and marketplace as with FIRST, and he delayed returning his company-issued laptop to FIRST. It would strain credulity to conclude that now Smith has not touched any of FIRST's trade secrets that remain in his possession. Rather, it is apparent he is using those wrongfully acquired trade secrets to compete with FIRST.

Florida courts routinely recognize that the risk of irreparable harm is so great in these situations that it justifies the entry of a preliminary injunction. *Aquent*, 2014 WL 117095, at *3 ("This threatened injury to Aquent outweighs the harm that a preliminary injunction may inflict on Ms. Stapleton. Aquent faces substantial harm if its trade secrets are misappropriated."); *Fortline*, 2013 WL 12101142, at *5 ("Absent an injunction in this instance, AVEM will have exclusive access to Fortiline's customer contact information and pricing points, and will be able to unfairly use this information to

divert clients and revenue away from Fortiline, which will likely damage Fortiline's goodwill in a manner that cannot be compensated by a monetary award."); *see also Osborne Assocs., Inc. v. Cangemi*, No. 3:17-CV-1135-J-34MCR, 2017 WL 5443146, at *14 (M.D. Fla. Nov. 14, 2017) ("Generations Salon[ ] does not have to wait until it has been harmed by the loss of a specific customer in order to obtain an injunction. Indeed, such a showing would place Generations Salon in a position of actually having to suffer damages that would be 'difficult to measure with reasonable certainty,' before obtaining an injunction to prevent such damages." (citation omitted)); *United Subcontractors, Inc. v. Godwin*, No. 11-81329-CIV, 2012 WL 1593173, at *9 (S.D. Fla. Feb. 3, 2012) (report and recommendation) ("Defendant Godwin, as IBP's Vice President of Sales, would be in the position to use the information regarding USI's strengths and weaknesses in overseeing and training IBP's sales force. Further, it would be inevitable for Defendant Godwin to use USI's confidential information in performing his duties for IBP."), *adopted*, 2012 WL 8652471 (S.D. Fla. Mar. 9, 2012).

## II.    Plaintiff Will Suffer Irreparable Harm in the Absence of an Injunction.

FIRST seeks narrow injunctive relief to prevent Smith from (1) diminishing the value of its trade secrets by sharing them with Stonemark, its direct competitor, and (2) using the trade secrets to aid in Stonemark's competition against FIRST in the marketplace, i.e., soliciting FIRST's actual and prospective customers.

FIRST has suffered and will continue to suffer irreparable harm as a result of Smith's theft of FIRST's trade secrets. "Florida law presumes irreparable harm where trade secrets are misappropriated for unauthorized use." *Everest Nat'l Ins. Co. v. Rockhill*

*Ins. Co.*, No. 8:16-CV-2803-T-35JSS, 2016 WL 8914545, at *6 (M.D. Fla. Oct. 5, 2016); *see Dotolo v. Schouten*, 426 So. 2d 1013, 1015 (Fla. Dist. Ct. App. 1983). Be-cause—as discussed above—FIRST's information was misappropriated, it is pre-sumed to be harmed irreparably. Also, "the loss of customers and good will is an ir-reparable injury and is difficult to measure." *Int'l Hair*, 2011 WL 5359264, at *9. Smith took confidential and proprietary information about FIRST's customers and insurance agencies—including loan interest rates and terms for *every* insurance agency and insur-ance-agency member in his portfolio—and he is now likely using that information to compete directly with FIRST for those customers. This threatened loss of customers and good will is a harm from which "the resulting damages are 'not easily quantifiable in money terms.'" *Fortline*, 2013 WL 12101142, at *3 (citation omitted).

Relatedly, because Smith is competing for and soliciting FIRST's customers, "irreparable injury is presumed." *N. Am. Prod. Corp. v. Moore*, 196 F. Supp. 2d 1217, 1231 (M.D. Fla. 2002); *see Int'l Hair*, 2011 WL 5359264, at *9 ("[I]rreparable harm may be suffered if Simply Organic continues to solicit customers from Plaintiff's cus-tomer list[.]"). Moreover, so long as the protected information, documents, and pro-prietary software that Smith stole remain in his hands, there is a risk of further "[d]estruction or moving of the evidence, [which] will greatly undermine [FIRST's] ability to prosecute [its] case, and cause further irreparable harm." *Dell Inc. v. Belgium-Domains, LLC*, No. CIV. 07-22674, 2007 WL 6862341, at *5 (S.D. Fla. Nov. 21, 2007). That risk is increased here because Smith has already destroyed evidence of his mis-conduct once. (Compl. ¶ 56; Ex. 1 ¶ 21.) An injunction by this Court is required to

stop this harm from continuing.

## III.    The Balance of Harms Favors Plaintiff.

The requested injunctive relief is narrow and would result in minimal harm, if any, to Defendant Smith. It would do little more than preserve the status quo and prevent Smith from destroying, retaining, using or disclosing FIRST's trade secret information—obligations he is already bound to under state and federal law. It would also ensure that the Court is apprised of the location FIRST's trade secrets and can monitor the protocol for remediating the harm caused by Smith's actions.

By contrast, every day that Smith is not immediately enjoined from using FIRST's trade secrets to solicit its customers and sharing those trade secrets with Stonemark means further substantial, imminent, and irreparable harm in the form of lost confidential information, lost business and income, and lost goodwill. *See AutoNation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1308 (S.D. Fla. 2004) (finding that the injury to the plaintiff outweighed any injury to the former employee considering (1) the value of the confidential business information to the employer; (2) that use of that information by a direct competitor would grant the competitor an unfair advantage).

The balance of harms weighs strongly in FIRST's favor solely in light of Smith's misappropriation of FIRST's trade secrets. *Everest Nat'l*, 2016 WL 8914545, at *6 ("[T]he Court finds that the balancing of harm favors Everest in this matter because the Court has been presented with evidence that Defendant Upton has absconded with confidential information and trade secrets and has taken employment with a direct competitor."). This harm is further compounded and detrimental to FIRST as a result

of Smith's blatant breach of his fiduciary duty to FIRST and his destruction of the evidence of his misconduct. (*See* Compl. ¶¶ 88–94.)

## IV. The Public's Interest is Served by Protecting Plaintiff's Trade Secrets and Preventing Unfair Competition.

Florida policy favors the protection of businesses and their trade secrets. *Hatfield*, 939 So. 2d at 158 ("[T]he existence of Florida's trade secret statute illustrates our state's interest in protecting businesses from theft of confidential information."). Indeed, Florida courts routinely hold that protecting a business's trade secrets from unlawful use and disclosure serves the public's interest. *See, e.g.*, *Alt. Med. Integration Grp., L.P. v. Langford*, No. 8:13-cv-2909-T-33AEP, 2013 WL 6195774, at *2 (M.D. Fla. Nov. 19, 2013) (holding a TRO would "serve the public interest by preserving faith in the agreements that businesses routinely make with their employees and by protecting trade secrets from unlawful use and disclosure."); *ACR Elecs., Inc. v. DME Corp.*, No. 11-62591-CIV, 2012 WL 13005955, at *14 (S.D. Fla. Oct. 31, 2012) ("Where an employee uses confidential information gained during his employment in breach of his duty of loyalty, it is appropriate to preliminarily enjoin the employee from further use of that information."); *VAS Aero*, 860 F. Supp. 2d at 1363 ("[A] preliminary injunction would affirmatively serve the public interest by protecting businesses from employees who misappropriate their trade secrets.").

## CONCLUSION

For the foregoing reasons, FIRST respectfully requests that the Court enter the requested Preliminary Injunction pending trial in this action.

74615036v3

WHEREFORE, FIRST respectfully requests that the Court grant the motion for a preliminary injunction and enter an order: (i) enjoining Smith from using, disclosing, or further accessing FIRST's trade secrets and information—including copying documents in his possession—that he forwarded or accessed from FIRST's systems; (ii) enjoining Smith from destroying, deleting, or failing to retain FIRST's trade secrets, documents, and information; (iii) directing Smith to return all of FIRST's trade secrets in his possession; (iv) directing Smith to notify the Court of all personal computers and accounts he used to send himself FIRST's trade secrets or to access FIRST's trade secrets and provide access for all such computers and accounts to a neutral expert for forensic examination; and (v) directing the parties to negotiate a forensics protocol, which would allow for analysis of Smith's actions and remediation of this information from Smith's possession.[4]

Filed: September 26, 2022

Respectfully Submitted,

FIRST INSURANCE FUNDING

By: /s/Jonathan E. Gale _____

Jonathan E. Gale / FBN 106938
E-mail: jegale@cozen.com
COZEN O'CONNOR
200 South Biscayne Blvd., Suite 3000

---

[4] FIRST suspects that Smith has disclosed its trade secrets to Stonemark and that other Stonemark employees are currently using them to unfairly compete with FIRST. Given the limitations on the evidence currently in FIRST's possession, however, FIRST does not seek a preliminary injunction against Stonemark—yet.

74615036v3

Miami, Florida 33131
Telephone: 305-720-2246

Daniel R. Saeedi (special admission forth-coming)
Kristine M. Kolky (special admission forthcoming)
Benjamin S. Morrell (special admission forthcoming)
Bailey Whitsitt (special admission forth-coming)
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2800
Chicago, Illinois 60601
Telephone: (312) 527-4000
Facsimile: (312) 527-4011
dsaeedi@taftlaw.com
kkolky@taftlaw.com
bmorrell@taftlaw.com
bwhitsitt@taftlaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the date listed below, I filed the foregoing document with the Clerk of the Court using the Court's CM/ECF filing system, which will provide notice of such filing to all counsel of record.

Date: September 26, 2022

s/ Jonathan E. Gale
Jonathan E. Gale
*Counsel for Plaintiff*