# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| FIRST INSURANCE FUNDING, A DIVISION OF LAKE FOREST BANK & TRUST COMPANY, N.A.;<br><br>Plaintiff,<br><br>v.<br><br>STONEMARK, INC., a corporation, and JERRY SMITH, an individual.<br><br>Defendants. | Case No. 8:22-cv-01975-WFJ-AAS |

## AFFIDAVIT OF JAMES MILLER

1. I, hereby declare under penalty of perjury that the following statements are true and correct.

2. I am an Executive Vice President and Chief Sales and Marketing Officer at FIRST Insurance Funding ("FIRST") in Northbrook, Illinois. I joined FIRST on October 12, 2004. I have personal knowledge of the facts set forth herein and can testify to them competently under oath if called upon to do so.

3. For more than 30 years, FIRST has been offering industry-leading premium finance services in the U.S. FIRST provides property and casualty insurance premium finance loans, primarily to small businesses. Adequate property and casualty insurance policies are a requirement for most companies, and a fundamental building block to job creation and small business success. While many large entities can self-finance or pay cash to purchase such coverage, many small businesses and entrepreneurs cannot afford the upfront expense, lack access to traditional sources of credit, or must finance such purchases to better manage cash flow.

74630743v2

The premium finance industry meets this need by providing short-term financing to facilitate the purchase of property and casualty coverage.

4. Premium finance lenders form business relationships with insurance brokers and agents. If businesses purchasing insurance policies from such brokers and agents need financing to obtain sufficient coverage, then the brokers and agents will arrange loans through their premium finance lender relationships.

5. We are a division of Lake Forest Bank & Trust Company, N.A. ("Lake Forest Bank"). Our relationship with Lake Forest Bank allows us to provide premium finance services to insurance brokers and agents, and offer its partners complete financial solutions.

6. At the time of Smith's employment with FIRST, Lake Forest Bank was a subsidiary of Wintrust Financial Corp. ("Wintrust").

7. We operate using FIRST's proprietary and trade secret software, technology, and hardware such as its loan system, "FIRST Insite", FIRST's Salesforce platform, Seismic platform (document management system containing, among other things, product demo and training videos) and the information therein; e-signature software; e-Complete (proprietary loan product), and related documents and videos; exclusive training and sales coaching materials; JumpStart sales videos; documents detailing financial activities of FIRST and/or its customers; documents detailing commercial loan interest rates and terms; documents detailing information related to insurance agencies and insurance agency associations; and documents detailing all commercial loans booked by FIRST for all insurance agencies and brokers (collectively, the "FIRST Trade Secrets"). FIRST has spent years and millions of dollars independently developing the FIRST Trade Secrets, which give FIRST a competitive edge over its peers. FIRST has taken reasonable measures to safeguard the FIRST Trade Secrets.

8. Premium finance lenders often compete on the speed and ease of doing business. Insurance brokers and agents expect that their insureds' loans can be submitted, booked, and funded within the same business day. FIRST developed its e-Complete loan product to provide a fast, paperless option for brokers and agents to arrange financing online. The multimillion dollar investment in the e-Complete technology resulted in a key differentiator for FIRST in the premium finance marketplace.

9. Premium finance lenders also compete on loan terms and interest rates. To enable a speedy loan process, FIRST preapproves terms and rates for the majority of loans submitted to FIRST by brokers and agents. FIRST spends significant time and effort learning about the brokers' and agents' insurance company relationships and clientele businesses to establish terms and rates (referred to as "pricing programs") that accurately reflect the credit risk of the portfolio. Throughout its relationship with brokers and agents, FIRST will adjust pricing programs to maintain competiveness, reflect increasing or decreasing delinquency, and drive revenue to brokers and agents where permitted by applicable state law.

10. FIRST and Wintrust also issued to Smith a separate electronic information and data security policy ("the Security Policy"). The Security Policy defines confidential information as "information that, if disclosed, could reduce the Company's competitive advantage, or cause significant damage to the Company," and defines highly confidential information" as "information that, if disclosed, could violate the privacy of individuals or cause significant damage to the Company." The Security Policy further states that "the unauthorized disclosure, modification, or destruction of this information would adversely impact the Company or subject it to legal action and penalties. This information is intended for use only within the Company." The Security Policy also states that "it is prohibited to use third party services which are not under

contract with Wintrust to transmit, store, or synchronize information assets." As an employee of FIRST, Smith was required to complete training on the Security Policy.

11. We also limit access to the FIRST Trade Secrets. FIRST's instructional videos are secured by only being shared via livestream, which prevents the material from being downloaded. FIRST also uses usernames and passwords as a further means of protecting the FIRST Trade Secrets. FIRST only grants access to the FIRST Trade Secrets for employees on a need-to-know basis.

12. In or about February of 2011, Smith began employment with us as the Regional Vice President of Sales and became a key employee of FIRST with significant responsibilities. Smith's duties for FIRST as a Regional Vice President of Sales included servicing an assigned area of focus in Florida, where he was tasked with working with valuable customers and relationships of FIRST, selling FIRST products and services to insurance brokers and agents, and providing guidance regarding FIRST's products and services specific to the financial decisions and needs of FIRST customers.

13. Eventually, we promoted Smith to the position of Executive Vice President of Sales, and was given even greater authority and responsibilities regarding FIRST's customers, prospective customers, and the FIRST Trade Secrets. Smith was a key and trusted employee of FIRST.

14. During his employment with FIRST, and for the limited purposes of performing his job duties as Regional Vice President and Executive Vice President for the benefit of FIRST, Smith was granted access to FIRST Trade Secrets. This included, but was not limited to, access to FIRST Insite, which includes detailed information about each of Smith's broker and agent clients and each loan submitted by the clients; access to FIRST's Salesforce platform that

includes further information about each of Smith's broker and agent clients; and access to Seismic, FIRST's document storage system in which it maintains some of the FIRST Trade Secrets. Among other FIRST Trade Secrets, Seismic hosts documents, videos, and other information relating to its proprietary e-Complete product.

15. On May 27, 2022, Smith gave notice of his resignation from FIRST.

16. Smith then immediately accepted employment with Stonemark. Stonemark is a direct competitor of FIRST, and is a finance company specializing in providing premium finance services. Upon information and belief, Stonemark hired Smith to perform the exact same sales role for Stonemark in the exact same geographic region.

17. Upon learning of Smith's resignation and anticipated employment with Stonemark, we undertook an immediate investigation to determine the extent of Smith's actions as they relate to the FIRST Trade Secrets and demanded that Smith return his company-issued laptop to FIRST.

18. As part of this investigation, we retained a forensics consultant to analyze Smith's computer systems and emails in order to determine whether any wrongful misconduct had occurred. This process continued for several weeks. Upon learning which documents were taken by Smith, our team analyzed these documents to determine whether they contained sensitive information. Upon learning that Smith had taken various sensitive company documents, we sought to determine whether there was a permissible

19. We discovered that, starting in April of 2022, Smith systematically downloaded and forwarded several documents and excel sheets with FIRST Trade Secrets related to customers and FIRST's financial activities to his personal email account. Just prior to Smith sending himself the information, he was inquiring about working for Stonemark, a fact documented through

computer forensics.

20.    This information is highly sensitive to us, and there is no legitimate purpose for why Smith would have sent himself this information, which includes: i) details about the commercial loan interest rates and terms (down payment amount and number of installment payments) underwritten and approved by FIRST for use by every single insurance agency and broker in Smith's portfolio, including historical information on commercial loan interest rates and amount financed volume sorted by commercial loan amount tiers; (ii) detailed information about every single insurance agency member of the Florida Association of Independent Agents, including members' business addresses and individual business contact information, the insurance agencies' Errors and Omissions policy premium amounts and whether the members financed the premiums, and information about the Florida Association of Independent Agents' dues structure; and (iii) detailed information about every single commercial loan booked by FIRST in the trailing twelve months for every single insurance agency and broker in Smith's portfolio, including but not limited to: insured business name, down payment amount, amount financed, loan interest rate and corresponding finance charge amount, number of payments, and whether the agent or broker received compensation for arranging the financing and the amount of such compensation as applicable.

21.    We discovered through our investigation, Smith also deleted folders and accompanying information from his work Outlook inbox, which further evidences his misappropriation.

22.    We discovered through our investigation, three days before Smith resigned, he forwarded to his personal email accounts a document that discussed commission rates and additional confidential information relating to specific customers of FIRST. We also discovered

that the day before Smith resigned, he accessed, downloaded and misappropriated confidential and proprietary demo videos, decks and training materials regarding Jumpstart videos; exclusive sales coaching offered by FIRST, FIRST COVID-19 Premium Finance Toolkit, and FlexPay-Payment Tools for Workers Compensation Insurance.

23. After Smith's resignation, we sent a cease and desist to Smith, which demanded that Smith (1) cease and desist from using or disclosing FIRST's confidential, proprietary or trade secret information, and inform FIRST as to the identity of any person or entity to whom Smith disclosed such confidential, proprietary or trade secret information; (2) immediately return (and not destroy) all confidential, proprietary or trade secret information belonging to FIRST, including paper files and customer contact information; and (3) cease and desist from all activities that interfere with FIRST's contracts, and actual and prospective customers, and confirm that Smith will comply with the law on a going forward basis.

24. Smith may use FIRST's Trade Secrets to unfairly compete with FIRST. Upon information and belief, Smith is selling premium finance services to insurance brokers and agents (identical to his role at FIRST) in and around southern Florida (the same region where Smith worked for FIRST). Because Smith misappropriated comprehensive information about the pricing programs for every client that he served at FIRST, Smith may use the pricing program specifics to undercut FIRST's loan terms and rates in targeted areas that Smith would otherwise not have sufficient detail to offer. Further, Smith could share one insurance agent's FIRST pricing programs with another insurance agent client of FIRST in attempts to move loan submissions by either agent from FIRST to Stonemark, which would create a breach of trust in FIRST's clients' relationships.

25. Smith may endanger FIRST's relationships by sharing the detailed loan

information that Smith downloaded from FIRST Insite. Upon information and belief, in April 2022, Smith used his password to access FIRST Insite and queried the system to produce a "New Loan Summary" for each broker and agent client of FIRST's to which Smith was the assigned salesperson. The New Loan Summary listed detail for every loan submitted by such clients and accepted by FIRST during the twelve months prior to the date on which Smith downloaded the data. Because the vast majority of insurance policies that FIRST finances have a twelve-month term, this New Loan Summary essentially included the entire loan portfolio for these brokers and agents. For each loan, the New Loan Summary detailed the borrower name, the total premium amount financed, the down payment amount and number of installment payments, the interest rate, and whether the broker or agent received compensation for arranging the loan and the amount of compensation if applicable. FIRST's clients' access to FIRST Insite is limited to only the loans submitted to FIRST by that insurance agent or broker. With the New Loan Summary information, Smith may provide valuable information about one insurance agency's premium finance portfolio with another insurance agency competitor. The sharing of such information would erode FIRST's clients' trust in FIRST's ability to protect its clients' confidential information and create a reputational disaster for FIRST.

26. Smith has not provided us with a reasonable response or assurances that he will comply with the cease and desist.

Further Affiant states not.

By: _____

SUBSCRIBED AND SWORN TO
before me this 23rd day of
September, 2022

_____
Notary Public



IVELY VERA
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
November 10, 2024