IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

FIRST INSURANCE FUNDING,

     Plaintiff,                      Case No.: 8:22-cv-01975-WFJ-AAS

v.

ROYAL PREMIUM BUDGET, INC.,
d/b/a STONEMARK, a corporation,
and JERRY SMITH, an individual,

     Defendants.

_____/

## DEFENDANT JERRY SMITH'S RESPONSE OPPOSING FIF'S MOTION FOR A PRELIMINARY INJUNCTION

Defendant Jerry Smith, by his undersigned attorney, respectfully requests that this Court deny Plaintiff FIF's request for a preliminary injunction.

## INTRODUCTION

FIF's motion for a preliminary injunction concerning long-time employee Jerry Smith's presumed use of FIF's supposedly "secret" information should be dead on arrival. First, FIF never asked Smith to sign any "non-compete" agreement. And FIF cannot demonstrate that any of the information at issue actually is secret, because FIF never asked Smith to sign a non-disclosure or confidentiality agreement, Smith never signed such an agreement, and there is no other documentation that the information genuinely actually was secret. If FIF never took reasonable steps to protect the information, it cannot now claim that the "presumed" use of that information has harmed it, let alone is harming it irreparably.

1

In May, Smith asked FIF for a raise—and FIF fired him. Then Smith started a new job. So FIF began a bullying campaign. FIF threatened Smith and his new employer with demand letters, trying to win the sort of "non-compete" it never asked Smith to sign in the first instance. At the end of August—four months after firing Smith—FIF sued him. Because Smith still would not give in, five months after firing Smith, FIF upped the ante and filed a motion seeking a preliminary injunctive relief against him. The Court should deny the motion for the reasons that follow.

Prior to litigation, FIF never told Smith not to disclose the terms of loans he booked or the names of agents he knew. FIF did *not* ask Smith to sign the kind of "non-compete" one often sees in key-man litigation in Florida. *Cf. Patriot Lending Servs., Inc. v. Amerifirst Fin. Corp.*, No. 8:20-CV-264-T-02AEP, 2020 WL 758155, at *1 (M.D. Fla. Feb. 14, 2020) (Jung, J.) (denying preliminary-junction motion). Smith is burdened by *no* restrictive covenant of *any kind*, let alone one providing for injunctive relief. Nonetheless, FIF wants injunctive protection for its alleged "trade secrets and [other] information." (Dkt. 17 PgID 131.)[1]

Preliminary injunctive relief is an extraordinary remedy requiring movant to show urgency. FIF has not shown that this is a "hair on fire" case. In fact, FIF does not try. Rather than point to any ongoing irreparable injury, FIF literally asks the Court to "presume" irreparable harm. (Dkt. 17, PgID 127-28.) That request depends

---

[1]     Likewise, FIF seeks return of electronic files allegedly taken. Yet there are no document-retention or return memoranda or representations made or signed by anyone—except with respect to machines, materials, and information that Smith promptly returned when FIF asked him to.

2

on a tremendous tower of assumptions: an assumption that the information at issue is secret, an assumption that Smith still has the information, an assumption that Smith is using the information, an assumption that Smith's (presumed) use would harm FIF, and, finally, an assumption that the (presumed) harm would be irreparable. FIF's contentions of irreparable injury are also proven false by FIF's own delay in moving for an injunction—four months after firing Smith. No irreparable injury, no preliminary injunction. *See, e.g.*, *Siegel v. LePore*, 234 F. 3d 1163, 1176 (11th Cir. 2000).

The injunctive relief FIF seeks is also hopelessly vague—and, where it is intelligible, it is shockingly broad. FIF asks the Court to "enjoi[n] Smith from using" not only trade secrets, but any "information" that Smith "accessed from [FIF]'s systems." (Dkt. 17 PgID 131.) FIF has not identified specific documents it wants Smith not to use, probably because to identify specific files would be the first step to admitting, most importantly, that FIF has not demonstrated and cannot demonstrate that FIF is likely to prevail on the merits of its trade-secret allegations: whatever files FIF means to identify are not secret under the statutes, were not misappropriated under the statutes, and are not currently being used to harm FIF. Each of these independently would dispose of FIF's claim. This Court should deny FIF's motion.

## RELEVANT FACTS

Premium-finance lenders lend insurance-policy holders money to pay premiums for insurance coverage. Most of the lenders' revenue comes in the form of financing charges included in the loans' APR. These loans are brokered through insurance agents, who function practically as the lenders' customers. Larger loans, and

loans brokered through large agency groups, tend to have lower financing charges (as a percentage of loaned premium). FIF can afford to, and does in fact, lend large premium amounts and work with large agency groups. FIF hired Smith in 2011 to work in sales. Smith generally focused on the larger premiums and agency groups characteristic of FIF's business. (Exh. A, Affidavit of Smith, ¶¶ 3, 6-8).

Stonemark is a much smaller premium financing lender than FIF, financing a fraction of the premiums that FIF finances on an annual basis. Stonemark targets a different part of the premium-financing industry than FIF does. In 2022, Stonemark made Smith an offer of employment, including an attractive compensation package. After Stonemark made this offer, Smith's superiors at FIF told him they thought FIF paid him enough. Hell hath no fury like an employer scorned. Smith tried to give two weeks' notice, but FIF fired him effective immediately. (*Id.*, ¶¶ 9, 14-18). The following month, FIF sent Smith a letter. FIF demanded that Smith return "secret" information and not solicit or "interfere" with FIF's clients.[2] FIF's also "demanded" that Smith cease using FIF's "trade secrets," without identifying what information that meant.

In response, counsel explained that Smith could not provide assurances as to the use of "trade secrets" without knowing what FIF meant by that phrase. Smith also observed that FIF never asked him to agree to a non-compete or non-solicitation agreement. (Exh. B, Response to Initial FIF Letter).

---

[2]      The letter also demanded that Smith return his work laptop, but Smith did not receive the self-addressed return box until the day *after* FIF sent out the June 2, 2022, cease-and-desist letter. (Exh. A, ¶ 19). Smith returned all materials promptly upon receiving the box, (*id.*) so FIF's representation to this Court that Smith "delayed returning his company-issued laptop," (Dkt. 17, PgID 126), is false.

In August, FIF sent Smith another letter. (Stonemark also was an addressee.) FIF's August letter alleged that Smith, while employed by FIF, had accessed some documents to which FIF gave him access, and emailed some of those documents to his personal email address. FIF asserted that this access constituted "misappropriation." FIF's August letter also demanded that Stonemark:

> 4.      Require that Mr. Smith agree to a one-year nonsolicitation clause relating to all customers for which he worked with or received confidential information while working for FIRST in the 24 months prior to his resignation date.

In response to FIF's August letter, counsel responded that FIF's sales staff, including Smith, routinely sent themselves emails from their work email to print documents more easily or perform tasks on their personal devices. Counsel also explained why Smith emailed documents to himself in his final months at FIF: to allow him to use a second screen to make rate adjustments and evaluate his performance in preparation for a discussion about his compensation. (Exh. C, Response to Second FIF Letter, at 1-3).

At the end of August, FIF sued Smith. FIF finally moved for preliminary injunction a month later.

## **ARGUMENT**

The entry of a preliminary injunction is "an extraordinary and drastic remedy." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F. 2d 1283, 1285 (11th Cir. 1990) (reversing entry of preliminary injunction where movant had not shown irreparable injury). Federal courts do not enter a preliminary injunction unless

the movant "clearly carries the burden of persuasion," *id.*, as to each of four elements: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction were not granted, (3) that the threatened injury to the plaintiff outweighs the harm an injunction may cause the defendant, and (4) that granting the injunction would not disserve the public interest," *Am. Red Cross v. Palm Beach Blood Bank*, 143 F. 3d 1407, 1410 (11th Cir. 1998).

FIF has not carried and cannot carry its burden of persuasion on any of the four elements. FIF has not shown a substantial likelihood of success on the merits. FIF has not identified *any* supposedly secret information with particularity, let alone identified information that both is secret and that Smith misappropriated. FIF has not even tried to demonstrate irreparable injury, nor can it, because lawful competition is not an injury. Having failed to try to demonstrate an injury without an injunction, FIF has not demonstrated that the potential injury to FIF would outweigh the harm Smith would suffer if the requested injunction were issued. Finally, it would disserve the public interest to allow FIF to disrupt the work of a former employee by Court order when FIF failed to secure a non-compete or non-solicitation agreement.

## I.   FIF Cannot Show a Substantial Likelihood of Success on the Merits Because Smith Has Not Misappropriated any Trade Secrets.

A plaintiff seeking a preliminary injunction must show a *substantial* likelihood of success on the merits. *E.g.*, *Am. Red. Cross*, 143 F. 3d at 1410 (reversing injunction when record did not establish that that movant was "*substantially* likely to establish that its donor lists [were] trade secrets" (emphasis added)). When it is "equally likely" that

6

either party could prevail on a misappropriation claim, the plaintiff has failed a substantial likelihood of merits success and is not entitled to a preliminary injunction. *Castellano Cosm. Surgery Ctr., P.A. v. Rashae Doyle, P.A.*, No. 8:21-CV-1088-KKM-CPT, 2021 WL 3188432, at *6 (M.D. Fla. July 28, 2021).[3]

FIF is not substantially likely to prevail on the merits of its trade-secrets claims.[4] A threshold issue is that FIF has not identified (e.g., by file name) the allegedly secret information. The Court must deny a motion for preliminary injunction when the movant fails to "describe its claimed trade secrets" sufficiently, *Beach 2 Bay Aerial Billboard Advert. v. Fla. Beach Advert.*, No. 8:17-CV-1049-T-27CPT, 2018 WL 2688780, at *1 (M.D. Fla. Apr. 24, 2018), because "the party asserting trade secret protection must describe the allegedly misappropriated trade secrets with reasonable particularity," *Levenger Co. v. Feldman*, 516 F. Supp. 2d 1272, 1287 (S.D. Fla. 2007).[5]

FIF has described the "secret" information in broad terms.

(A)   Information to which FIF does not even allege Smith still has access:
　　　(1)   FIF's "proprietary software, including Seismic and e-Complete"
　　　(2)   "training and sales videos from Jumpstart" and
(B)   Documents that FIF seems to contend Smith has in his possession:
　　　(3)   Concerning FIF's customers and

---

[3]　　When "[b]oth sides" in a putative trade-secret case "invoke affidavits," the "evidence presented" may be "in equipoise." *Patriot Lending Servs., Inc.*, 2020 WL 758155, at *2. If the "record" does not "unequivocal[ly]" show that the movant for a preliminary injunction "is likely to prevail on the merits of the suit," the movant has not met its burden, and the motion should be denied. *Id.*

[4]　　FIF alleged claims under the Florida Uniform Trade Secrets Act and the federal Defend Trade Secrets Act, statutes with similar text. *Compulife Software Inc. v. Newman*, 959 F. 3d 1288, 1311 n.13 (11th Cir. 2020). The same standards apply under both. *Id.* (*See also* Dkt. 17, PgID 117 n.2.)

[5]　　Although FIF identified files Smith *sent* himself, some cannot be FIF's information at all. For instance, the document "hsa.pdf," which Smith allegedly sent himself on January 24, 2022 (*see* Dkt. 17-2 PgID 165), relates to his healthcare benefits, not valuable commercial secrets. FIF seeks to enjoin Smith from using this file (and *all* information "that he forwarded or accessed," (Dkt. 17, PgID 131)). That shows the overbreadth of FIF's request, which is not about protecting FIF's trade secrets.

(4)   Concerning FIF's "business strategies and operations."

(Dkt. 17, PgID 118).

For none of these categories of information has FIF demonstrated both that the information is a "trade secret" and that Smith "misappropriated" it. As to the "proprietary software" and "training and sales videos," FIF cannot show that Smith *could*, let alone *did*, misappropriate them. For the documents concerning FIF's customers and "business strategies and operations"—i.e., details about agencies and loans in Smith's *own portfolio* and commission rates, along with publicly available information from a trade organization (*see* Dkt. 17, PgID 114-15)—FIF provides insufficient evidence to show that he obtained them through improper means, disclosed them, or even used them. Finally, the information is not secret because it is not valuable, not subject to serious efforts to keep it confidential, and is publicly available.

## A. Smith did not misappropriate any of FIF's software or training videos because he did not access (and could not have accessed) the materials outside of FIF's systems.

The "proprietary software" and "training and sales videos," (Dkt. 17, PgID 118), that FIF identifies in its motion apparently refer to a collection of items that Smith allegedly viewed on FIF's document management system, to which FIF refers as the "Seismic" platform, on May 26, 2022. (*See* Dkt. 17 PgID 115). To be clear, Smith was not looking at anything that reasonably could be characterized as a computer program itself: e.g., software code. What Smith tried to view was a video *about* a

8

software product. (Exh. A, ¶ 33). Smith tried to find that video for literally *two minutes*.[6] And Smith could not have removed this information from FIF's system. FIF alleges that its "instructional videos are secured by only being shared via livestream, which prevents the material from being downloaded." (Compl. ¶ 29).[7]

**B. Smith did not misappropriate documents about FIF customers or "business strategy," nor has FIF demonstrated that they are trade secret documents.**

Documents concerning FIF's "customers" and "business strategies and operations" apparently concern loans FIF had made and Smith's commission rates, along with trade-group information. (*See* Dkt. 17, PgID 114-15; Dkt. 17-2, Exh. B).

**1. FIF has not demonstrated that Smith "misappropriated" documents about clients or "business strategies" because FIF has not demonstrated that Smith had a duty to maintain the secrecy of that information, used it, or disclosed it to any third party.**

Smith did not commit "misappropriation" by "acquisition" or by "use." With respect to "acquisition," Smith had no "duty to maintain secrecy," and therefore did not misappropriate any information by "acquisition." An employee's duty is "not to engage in *disloyal* acts in anticipation of future competition," *Fortline, Inc. v. Moody*, No. 12-CV-81271, 2013 WL 12101142, at *4 (S.D. Fla. Jan. 7, 2013) (emphasis added), as FIF's own case observes. (Dkt. 17, PgID 124). Smith emailed himself documents for purposes related to his work for FIF. (Exh. A, ¶ 27-30). These acts were

---

[6]    According to FIF, Smith viewed these items in a single browsing session between 5:32 p.m. and 5:33 p.m. on that day. (Dkt. 17-2, PgID 152-54, Tbl. 3).
[7]    No video or software files appear on the list of emails that he sent himself. (Dkt. 17-2, PgID 160-66). Smith's computer access was shut off immediately after his termination, (Exh. A, ¶ 19), so after that time, Smith never could have acquired these materials, let alone used them.

not harmful to FIF's interests, so neither act was disloyal.[8] FIF also alleges that Smith violated "Security and Confidentiality Policies" that FIF "shared" with Smith. (Dkt. 17, PgID 124). But an employer's unilateral policy statements cannot substitute for contractual obligations in Florida. *Carlucci v. Demings,* 31 So. 3d 245, 247 (Fla. 5th DCA 2010). Just as FIF does not allege that Smith executed a non-disclosure or "non-compete" agreement, FIF does not allege that Smith executed a confidentiality *agreement*. Without contractual obligations to the contrary, the mere acquisition of information does not breach a duty to maintain secrecy. *See Castellano,* 2021 WL 3188432, at *7 (finding that plaintiff failed to show substantial likelihood that defendant breached duty to maintain secrecy when it was unlikely that there was confidentiality agreement of any "legal effect" at the time of misappropriation); *Patriot Lending Servs.,* 2020 WL 758155, at *1 (Jung, J.) (denying injunctive relief where defendants were subject to handbook policy, but no "express and complete 'non-competes' that one often sees in key-man departure litigation in Florida.")

With respect to "use," FIF offers no evidence that Smith has *used* the loan and interest data or FAIA data. FIF only directs the Court to *infer* that Smith *must* be using or disclosing FIF's trade secrets. (Dkt. 17, PgID 126-27).

In support of this plea for inference, FIF relies heavily on *Aquent LLC v. Stapleton*, No. 6:13-CV-1889-ORL-28, 2014 WL 117095 (M.D. Fla. Jan. 13, 2014).

---

[8]     FIF attempts to characterize this emailing pattern as unique or suspicious, but, like his supervisor and colleagues, Smith sent himself emails for years. (Exh. A, ¶¶ 23-26). The fact that this was a routine practice, rather than a new development, undermines FIF's insinuations that Smith sent himself these documents in anticipation of competing with FIF.

(Dkt. 17, PgID 124-25). But FIF both omits the part of *Aquent* supporting Smith's position and stretches the rest of the case far beyond its facts.

*Aquent* concerned a former employee who, unlike Smith, had signed a confidentiality agreement but who, like Smith, was not subject to a non-solicitation agreement. The former employer sought to enjoin the former employee from soliciting her former clients, among other things. Denying that request, the *Aquent* Court explained that the former employee "likely knows much of the information about clients, including pricing, in these categories *without the need for any misappropriated information* . . . ." *Aquent*, 2014 WL 117095, at \*4 (emphasis added).

Likewise here, the information that Smith allegedly misappropriated was information about his *own portfolio*, of which he has personal knowledge. (Exh. A, ¶¶ 10, 35). Smith also personally developed client relationships, down payment structures, installment availability structures, and buy and sell rates for products described in these documents. (Exh. A, ¶ 10). And the information is not secret but readily available: agents in the premium finance industry regularly share the interest rates they receive to shop around for rates. (*Id.*, ¶ 36). Smith *does not need* the information he sent himself to lawfully compete with FIF, so FIF's inference that he *must* be using or sharing that information is unwarranted.

To the extent the *Aquent* favored the movant, the facts differ considerably from the facts here. The *Aquent* Court inferred misappropriation because the former employee had "*admitted* to *spoliation*," directing "her husband to destroy the four

thumb drives" containing the data that her former employer requested her to return to it. *Id.* at *3 (emphases added). *Based on this admitted spoliation*, the Court made an adverse interference that the destroyed data contained evidence of misappropriation. *Id.* Smith's actions are the opposite of the defendant in *Aquent*. FIF asked Smith to return his FIF laptop—which he did.[9]

## 2. The documents that Smith sent himself are not trade secrets.

A trade secret is only protected to the extent that it (A) "derives economic value from not being readily ascertainable by others" and (B) "is the subject of reasonable efforts to maintain its secrecy." *Am. Red Cross*, 143 F.3d at 1410. FIF cannot demonstrate that the loan and interest rate data or FAIA information that Smith sent himself satisfies either of these requirements.

### a. FIF has not demonstrated that the customer data documents Smith sent himself are secret or economically valuable, let alone that they derive economic value from their secrecy.

"Information that is generally known or readily accessible to third parties cannot qualify for trade secret protection." *Am. Red Cross*, 143 F. 3d at 1410. Moreover, information must "derive economic value" from not being discoverable by "persons

---

[9]    Smith deleted emails from his work computer, but he did so in the ordinary course of business to comply with IT-imposed inbox size requirements. (Exh. A, ¶ 32). In the Eleventh Circuit "an adverse inference is drawn from a party's failure to preserve evidence *only* when the absence of evidence is predicated on *bad faith*." *Penalty Kick Mgmt. v. Coca-Cola*, 318 F. 3d 1284, 1294 (11th Cir. 2003) (emphases added). Bad faith can *only* be established by direct evidence or when the "act causing the loss *cannot* be credibly explained as not involving bad faith by the reason proffered by the [purported] spoliator." *Tesoriero v. Carnival Corp.*, 965 F. 3d 1170, 1185 (11th Cir. 2020) (emphasis added) (quotation omitted). FIF does not contend it has direct evidence of bad faith. The act causing the loss can be credibly explained here. Smith deleted folders in his inbox to comply with FIF-imposed restrictions on the amount of data that Smith could store in his inbox at any time. (Exh. A, ¶ 32).

who can obtain economic value from its disclosure or use," or else that information is not a trade secret. Fla. Stat. § 688.002(4)(a). FIF has not shown that the materials Smith sent himself via email meet these requirements, and thus cannot claim trade secret protection of them.

First, the FAIA member information is not secret. FAIA is a trade association whose membership directory is available to any associate member of that organization (including both Stonemark and FIF). (Exh. A, ¶ 31). This information is "readily accessible to third parties" and thus "cannot qualify for trade secret protection." *Am. Red Cross*, 143 F. 3d at 1410.

The "detailed information about . . . commercial loan[s] booked by [FIF] in the trailing twelve months," meanwhile, would not be useful to any competitor because it is not current. *See LexJet, LLC v. Big Dog Media Sols., LLC*, No. 8:14-CV-538-T-17TBM, 2014 WL 7642095, at *7 (M.D. Fla. Sept. 16, 2014), *adopted in relevant part*, 2015 WL 224657 (denying preliminary injunction where it was unclear that the alleged trade secret was "not so dated as to make it of no competitive value"). The documents that this claim apparently refers to are documents describing some FIF loans.

What FIF fails to mention is that the "trailing twelve months" are the twelve months prior to *December 31, 2021*. This is significant for two reasons. First, loans in the premium insurance industry are typically made on terms of one year or less. (Exh. A, ¶ 39). This means that many of the loans described in these reports would have matured by the time that Smith was terminated, and that almost all of them would have matured by the date of this filing.

Second, interest rates in the premium insurance industry fluctuate based on Federal Reserve interest rates, (*id.*, ¶ 38), which have increased five times in the past year. Because these documents describe old loans from a different financial environment, they are effectively useless. No third party could "gain economic value" from the "disclosure or use" of these documents, so they are not protected as trade secrets. *See* Fla. Stat. § 688.002(4)(a).

Similarly outdated are documents that Smith sent himself relating to "commercial interest rates and terms" offered to agencies in his former portfolio. (Dkt. 17, PgID 114). As interest rates have skyrocketed in the time since Smith left FIF, this data is outdated and commercially worthless. (Exh. A, ¶ 38). And the "commission rates" documents FIF identifies, (Dkt. 17, PgID 115), refer largely to Smith's *own* commission rates, (Exh. A, ¶ 34), which would have little value to third parties.

To the extent that any of the information discussed above ever had any economic value, the information was still "readily accessible to third parties." *Am. Red Cross*, 143 F. 3d at 1410. As the Florida Court of Appeals explained in *Templeton v. Creative Loafing Tampa, Inc.*, a compilation of information is not trade secret where the information within it could be easily accessed through public sources. 552 So. 2d 288, 290 (Fla. 2d DCA 1989). Likewise here, Smith—or any other premium finance salesperson—could easily obtain the information regarding interest rates and loans offered through agents by picking up a phone. Agents in the premium finance industry regularly disclose the rates offered by their incumbent financing company at the request of salespeople in hopes of receiving a better rate from a competitor. (Exh.

A, ¶¶ 36-37). Because agents regularly disclose this information—and are not prohibited from doing so—FIF cannot claim this information is secret.

> ### b. FIF has not demonstrated any efforts, let alone reasonable efforts, to maintain the secrecy of the claimed customer data and strategy documents Smith allegedly sent himself.

Information is not statutorily protected as a trade secret unless the owner of the putative secret subjects the information to "efforts that are reasonable under the circumstances to maintain its secrecy." Fla. Stat. § 688.002(4)(b). FIF alleges that it took a few steps to maintain the secrecy of information it now contends is secret, including non-contractual security policies, restricted access through password protection, and revocation of employee access upon termination. (Compl. ¶¶ 19-32).

But steps like these are not dispositive. *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F. 3d 1279, 1300 (11th Cir. 2018). As the Eleventh Circuit has observed, an employer may "compromise the efficacy" of steps like the ones FIF took when the employer permits an employee to keep company information on a personal device. *Id.* Similarly, an employer has not protected information sufficiently to qualify it as a trade secret when the employer fails to "prevent its employees . . . from transferring the [allegedly trade secret] file to a compact or portable disk or to their home computers." *Diamond Power Int'l v. Davidson*, 540 F. Supp. 2d 1322, 1335 (N.D. Ga. 2007).[10] While the employer in *Diamond Power* had secured its network with password and firewall

---

[10]    *Diamond Power* concerned the Georgia Uniform Trade Secrets Act. The Eleventh Circuit has noted that Georgia and Florida Uniform Trade Secrets Act have similar language. *Yellowfin Yachts, Inc.*, 898 F. 3d at 1300 n. 20. The Eleventh Circuit has specifically cited *Diamond Power* as persuasive in a case dealing with the Florida Uniform Trade Secrets Act. *Id.* at 1300.

protection, and had adopted a general confidentiality policy that covered the "sort of information" that was allegedly misappropriated, it had not instituted a *specific* policy to restrict use of the file at issue, the file was not marked confidential, and access was unrestricted such that "employees could, an apparently did, retain the [file] on their own computers indefinitely." *Id*. Therefore, the employer had not kept the file secret.

Like the *Diamond Power* movant, FIF cannot demonstrate that it made reasonable efforts to maintain the secrecy of the loan and interest rate data at issue. Although FIF purports to have had drafted general "policies" about information stored on company systems, FIF employees routinely sent FIF materials to their personal email addresses. (Exh. A, ¶¶ 25-26). Indeed, Smith's supervisor, David Abernathy, knew that Smith did this and admitted to doing it himself. (*Id.*, ¶¶ 24, 26). Many of these materials were shared with customers, who, in turn, often shared them with other premium lenders. (*Id.*, ¶ 37). And FIF has not alleged that any of the files were marked as confidential, nor that there were meaningful controls preventing access to these materials outside of company systems. With no concerted institutional effort to prevent Smith or other salespeople from emailing documents to themselves, FIF cannot now claim that it undertook efforts to keep its documents secret.

## II. FIF has not demonstrated irreparable injury because is not entitled to a "presumption" of injury, FIF's "presumptive" injury of market competition is not legally cognizable, and any actual injury could be compensated by monetary damages.

Irreparable injury "is the sine qua non of injunctive relief." *Siegel*, 234 F. 3d at 1176. The movant must show that the alleged injury is both "actual" and "imminent."

*Id.* "Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a *substantial* likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Id.* (emphasis added). "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *City of Jacksonville*, 896 F. 2d at 1285. And a "party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F. 3d 1244, 1248 (11th Cir. 2016).

FIF makes no attempt to prove that it will suffer actual, imminent injury. FIF asserts that this Court must presume the existence of an injury because of Smith's supposed misappropriation. (Dkt. 17, PgID 127.) But FIF relies on abrogated law, and misapplies the old rules, at that. In particular, FIF relies on *Dotolo v. Schoulten*, 426 So. 2d 1013, 1015 (Fla. 2d DCA 1983), along with some federal cases relying on it, to claim a "presumption" of irreparable injury in a trade-secret case.

The Court should not apply *Dotolo* because it concerns an abrogated cause of action. As Judge Mizelle recently held, *Dotolo* "is a pre-FUTSA case applying a Florida common law cause of action that was expressly displaced by FUTSA." *Castellano Cosm. Surgery Ctr.*, 2021 WL 3188432, at *8 (declining to apply "presumption").

Even if the pre-Uniform Act presumption still applied, FIF has not proven the conditions sufficient to trigger the presumption. In particular, FIF has not demonstrated actual ongoing misappropriation. FIF contends that Smith accessed certain information and deleted some emails. Based on this allegation, FIF contends

that the Court should *assume* that Smith still has the information *in his possession*. Having assumed Smith's possession, FIF asks the Court to *assume* that Smith is *using* the information. Finally, assuming that Smith is using the information, FIF further asks the Court to "presume" that Smith's use of the data is not only harming FIF, but harming FIF "irreparably," such that monetary damages could not compensate it for the injury. Such a rickety tower of assumptions and inuendo cannot satisfy FIF's burden of persuasion. At the very least, FIF needs to demonstrate that Smith actually is using information that is actually protected by the trade-secret statutes—not merely that Smith once saw information that FIF now considers confidential and that FIF guesses Smith might still have it somewhere.

To the extent that any presumption exists, it is rebutted by FIF's failure to prosecute this case with urgency. *Cf. Wreal*, 840 F. 3d at 1248-49 (affirming district court's finding of no irreparable harm where plaintiff delayed five months in seeking preliminary injunction). FIF's four-month delay before moving for this preliminary injunction undermines a finding of irreparable harm.

The competition from Smith that FIF fears is not an "injury" that trade secret law protects against. Smith may rely on his relationships and knowledge he built while developing that portfolio "without infringing on any of [FIF's] rights." *Am. Red Cross*, 143 F. 3d at 1411. And even if the "injury" from Smith's potential competition were cognizable—it isn't, *id.* at 1410—*it would be redressable by monetary damages*. FIF already knows the pool of agents identified in the "secret" documents Smith supposed might "use." Business lost from those agents could be discovered to calculate FIF's "actual

18

loss[es]." Fla Stat. § 688.004(1). Because FIF's "presumptive" injuries are not actual, imminent, or irreparable, FIF is not entitled to injunctive relief.

## III.  Because FIF Will Not Suffer Any Injury in the Absence of an Injunction, The Balance of Harms Favors Smith.

FIF's requested relief is so vague that ensuring compliance would be virtually impossible. FIF asks this Court to enjoin Smith from "using, disclosing, or further accessing" FIF's claimed "trade secrets" and other "information." FIF has not identified what actual "information," "secret" or otherwise, it contemplates. And FIF has not described what it would mean to enjoin Smith's "use" of information that either is not in Smith's possession, publicly available, or contains (mostly outdated) data about transactions with certain insurance agents whom Smith knows through personal relationships and who also have that information in their possession.[11]

The requested injunction would burden Smith in at least three other specific ways. First, because FIF and Smith never executed a non-compete, non-solicitation, or non-disclosure agreement, (Exh. A, ¶ 11), FIF is seeking to enjoin Smith from engaging in otherwise lawful conduct. Second, FIF would have Smith sequester his electronic devices—on FIF's timetable, rather than his own—so FIF could fish in his personal electronic devices. This would cause significant disruption to Smith's life and work, and it would prevent Stonemark from using his services. Finally, an injunction would interact harmfully with the lawsuit and the recent hurricane Ian.

---

[11]  Is FIF seeking Court entry of the non-solicitation agreement it "demanded" for the first time in August, with no contractual or legal basis? Is FIF asking Smith to forget everything he has learned in years of experience in the industry?

The burden on FIF in the absence of an injunction, meanwhile, is slight. Smith returned his work computer to FIF months ago, and FIF's expert has already analyzed it. Moreover, Smith (through counsel) has preserved his phone, email, and current computer. An injunction would preserve no additional evidence.[12]

## IV.    Granting a Preliminary Injunction Would Disserve the Public Interest.

The public "policy against inhibiting competition in the marketplace" is at least as strong as the policies furthered by trade secrets law. *Fleming Sales Co. v. Bailey*, 611 F. Supp. 507, 511-12 (N.D. Ill. 1985). After all, competition is America's "very way of life." *Wackenhut Corp. v. Maimone*, 389 So. 2d 656, 657 (Fla. 4th DCA 1980). The public interest is disserved by FIF's campaign to make a former employee quit his new job.[13]

## CONCLUSION

For the foregoing reasons, Smith requests that this honorable Court **DENY** FIF's motion for a preliminary injunction.

Dated: October 24, 2022
Miami, Florida

Respectfully submitted,
TODD R. FRIEDMAN, P.A.
1101 Brickell Avenue, Suite S700
Miami, FL 33131
Tel: (786) 536-7190
todd@toddfriedmanpa.com

By: */s/ Todd Friedman*
Todd R. Friedman

---

[12]     FIF also asks the Court to impose specific discovery protocols. But counsel now are negotiating discovery issues. So FIF is not harmed by non-entry of that request.
[13]     FIF apparently has allowed its registration to do business in Florida to lapse. (Exh. D.) The Court should not grant equitable relief to an entity doing business in Florida illegally. Moreover, FIF may not have standing to sue under Florida law: Florida law does not allow a foreign corporation that failed to register to maintain suit. *Art Brokers USA, Inc. v. Angulo*, No. 06-60045-Civ-Altonaga/Turnoff, 2006 WL 8432189, at *2 (S.D. Fla. Mar. 15, 2006).

Florida Bar No. 97919

*Counsel for Defendant Jerry Smith*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on  October 24, 2022 a true and accurate copy of the foregoing was electronically filed on CM/ECF, which will serve same via email to all counsel of record listed in the service list below.

By: */s/ Todd Friedman*

## Service List

**Taft Stettinius & Hollister LLP**
111 E. Wacker Dr.
Suite 2800
60601, Ste 2800
Chicago, IL 60601
312-840-4489
Benjamin Morrell, Esq.
bmorrell@taftlaw.com
Connie Kremer, Esq.
ckremer@taftlaw.com
Daniel Saeedi, Esq.
dsaeedi@taftlaw.com
Rachel Schaller, Esq.
rschaller@taftlaw.com
*Counsel for Plaintiff*

**Burstyn Law PLLC**
1101 Brickell Avenue
Suite S700
Miami, FL 33131
305-204-9808
Sean Burstyn, Esq.
sean.burstyn@burstynlaw.com
*Counsel for Defendant Stonemark*

**Cozen O'Connor**
Southeast Financial Center
200 South Biscayne Blvd.
Suite 30th Floor
Miami, FL 33131
305-397-0819
Jonathan Gale, Esq.
jegale@cozen.com
*Counsel for Plaintiff*

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FIRST INSURANCE FUNDING,
A Division of Lake Forest Bank &
Trust Company, N.A.,

Plaintiff,                              Case No.: 8:22-cv-01975-WFJ-AAS

v.

ROYAL PREMIUM BUDGET, INC.,
d/b/a STONEMARK, a corporation,
and JERRY SMITH, an individual,

Defendants.

_____/

## AFFIDAVIT OF JERRY SMITH IN SUPPORT OF HIS RESPONSE OPPOSING FIF'S MOTION FOR A PRELIMINARY INJUNCTION

BEFORE ME, the undersigned authority, personally appeared Jerry

Smith, who, after first being duly sworn, deposes and says:

1.     My name is Jerry Smith, I am over the age of 21, and competent to make this affidavit.

2.     The contents of this affidavit are based on my personal knowledge.

3.     I was employed by FIRST Insurance Funding ("FIF") between approximately February 2011 and May 2022.

4.     I am currently employed by Royal Premium Budget, doing business as Stonemark.

5.      Both companies operate in the premium finance industry, but they cater to different markets.

6.      Premium finance lenders lend insurance-policy holders money to pay premiums for insurance coverage. Most of the lenders' revenue comes in the form of financing charges included in the loans' APR. These loans are brokered through insurance agents, who function practically as the lenders' customers. Larger loans, and loans brokered through large agency groups, tend to have lower financing charges (as a percentage of loaned premium).

7.      FIF, being owned by a publicly traded family of banks, has a very low cost of capital and can afford to lend large premium amounts and to sell to large agency groups. In my role at FIF, I focused on these larger premiums and larger agency groups that characterize FIF's business.

8.      At FIF, I was in charge of managing a number of large National Relationships in my territory; Assured Partners, Brown & Brown, IOA, MMA, Gallagher, Acrisure, Acentria, et al. Those relationships accounted for nearly 80% of my volume at FIF. At Stonemark, I work with none of these.

9.      Stonemark is a much smaller premium financing lender, financing a fraction of the premium on an annual basis that FIF finances. Before Stonemark hired me, I was aware that Stonemark does not substantially compete with FIF, since they target different parts of the premium-financing industry.

10.     During my time at FIF, I was one of its top-performing salespeople. I personally developed relationships with agents and brokers in my portfolio. I also was personally involved in developing down payment structures, installment availability structures, and buy rates and sell rates for agencies. I have personal knowledge of my former portfolio and personal connections with agents in my former portfolio.

11.     Nobody at FIF ever asked me to sign a non-compete, non-solicitation, or non-disclosure agreement before I ended my employment there.

12.     The identities of the agents with whom I worked are not confidential. In fact, many agents commonly engaged the services of multiple premium finance companies at the same time.

13.     The terms of loans I brokered for FIF were not confidential. In addition, various agencies often shared FIF's rate and term packages to FIF's competitors, so that pricing was not a significant distinguishing factor in competing for business.

14.     I received a job offer from Stonemark in April or May 2022. I was offered an attractive compensation package from Stonemark, and the first thing I did was disclose and discuss the offer to my superiors at FIF.  I would have preferred to have stayed at FIF.

15.     FIF President Mark Steenberg asked me not to make a decision until we had a chance to meet face to face.  Once we met, Mr. Steenberg told me that there would be no adjustments to my income, except in very rare cases (less than 5% of my portfolio).

16.     After much consideration, I decided to resign my position at FIF, and I gave my two weeks' notice to FIF on May 26, 2022.

17.     I had offered to stay on with FIF for two weeks and help transition my accounts to FIF employee Greg Erwin.

18.     FIF instead fired me on May 27, 2022.

19.     FIF issued me a company laptop while I worked there. Upon my termination, FIF shut off access to the laptop immediately. I was told to wait to return the laptop until I received self-return boxes from FIF's IT department. I returned the laptop, along with other sales materials in my possession, promptly upon receiving the return box on June 3.

20.     I started work at Stonemark on June 6, 2022.

21.     I understand that FIF is accusing me of stealing or "misappropriating" its trade secrets. I disagree with this accusation.

22.     FIF's claim that I sent myself emails in order to steal their information is false.

23.     During my time at FIF, I regularly sent work-related documents from my work email account (jerry.smith@firstinsurancefunding.com) to my personal email account (jsmith771013@gmail.com).

24.     I have done this since at least 2017, with the full knowledge of my supervisor, David Abernathy.

25.     I was not the only person at FIF who forwarded emails between his work and personal email accounts.

26.     It was common practice among FIF relationship managers to send FIF documents to our personal email accounts to print out documents on personal printers or in copy shops and hotel business centers. I have discussed this practice with my supervisor, David Abernathy, who has told me that he also engaged in this practice.

27.     I sent myself emails so that I could work on multiple devices, utilizing a two-screen setup to make certain tasks more efficient.

28.     I did not send these emails to myself for the purpose of competing with FIF or hurting its business.

29.     For example, in one of the emails that FIF claims shows my "misappropriation," I emailed myself a worksheet that I used to adjust each agency's buy rates in response to a recent increase in interest rates by the Federal Reserve. This was a regular task that I performed in my role at FIF. Accessing this worksheet on a personal device allowed me to view detailed information on one screen while I made the adjustments on another screen.

30.     I also sent myself data in order to evaluate my own book of business in advance of a meeting with FIF's company president, Mark Steenberg, mentioned above. In preparation for this meeting, I did a deep dive into my portfolio with the intent of knowing exactly what my book looked like. For example, I wanted to remind myself what agencies were off-limits to increased compensation and which were possible increased compensation targets.

31.     FIF's claim that the information regarding the Florida Association of Independent Agents (FAIA) is somehow proprietary or secret is false. The FAIA membership directory is available to all associate members, which include both Stonemark and FIF.

32.     FIF's claim that I deleted emails from my work account to cover up data theft is also false. I deleted emails periodically in the regular course of business due to IT-implemented size restrictions on my Outlook inbox.

33.    FIF's claim that I "misappropriated" their training videos or E-Complete software on May 26, 2022, is also false. I was looking for an E-Complete video for a new agency setup, as a contact had expressed interest in the technology. I did go into the Seismic platform, looked around for the video, could not find it, and exited. I did not take anything from that session.

34.    The documents that I sent myself on May 24, 2022, related to my own compensation and commission rates because it was the day I had a face to face meeting with FIF President Mark Steenberg, as referenced above.

35.    Much of the information regarding loans and interest rates that were contained in the reports and documents I sent myself are either known by me or are routinely shared by agents with competitor premium finance companies.

36.    It is standard practice in the premium finance industry for salespeople to call agencies and ask them what rates their incumbent financing company is charging. Agencies regularly give this information out to shop around for better rates.

37.    Premium insurance salespeople often share materials describing interest rates and other aspects of the financial products they sell with customers. Customers are free to share these materials with other premium lenders' salespeople and often do. There is nothing that prohibits them from doing that.

38.    Rates in the premium finance industry change based on changes in Federal Reserve interest rates. Because interest rates have increased several times this year, the information contained in the reports and documents I emailed myself does not provide insight into any of FIF's current offerings. The data is outdated and commercially worthless.

39.    Also, loans in the premium finance industry typically last for a year or less. This means that much of the loan information contained in the documents I sent myself was outdated at the time I left my position and is even more outdated now.

40.    In my new role, I have not needed to use any of financial information contained in the documents I sent myself while I worked at FIF.

I hereby declare under penalty of perjury that the foregoing statements are true and correct.

FURTHER AFFIANT SAYETH NAUGHT.

By

JERRY SMITH

STATE OF _Florida_ )
                                      )
COUNTY OF _Manatee_ )

I HEREBY CERTIFY that on October 24, 2022, before me, an officer duly authorized in the aforesaid State and County to take acknowledgments, oaths, and averments, personally appeared, JERRY SMITH, who produced a valid driver's license as identification, and who duly took an oath, executed the foregoing instrument, and acknowledged before me that he executed same.

NOTARY PUBLIC
State of Florida
My Commission Expires: _July 7, 2026_

_seal_

BARBARA A AUBIN
Notary Public · State of Florida
Commission # HH 285070
My Comm. Expires Jul 7, 2026
Bonded through National Notary Assn.

# EXHIBIT B

# KAUFMAN, PAYTON & CHAPA

**LAWRENCE C. ATORTHY**
*also admitted in California*
Direct Dial: (248) 626-7138
E-Mail: lcatorthy@kaufmanlaw.com

A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELORS AT LAW
200 KAUFMAN FINANCIAL CENTER
30833 NORTHWESTERN HIGHWAY
FARMINGTON HILLS, MICHIGAN 48334-2551

(248) 626-5000
TELEFACSIMILE: (248) 626-2843
www.kaufmanlaw.com

**DETROIT**
119 State Street
Detroit, MI 48226
(248) 626-5000
Facsimile: (248) 626-2843

**GRAND RAPIDS**
161 Ottawa Avenue NW, Suite 205-C
Grand Rapids, Mi 49503
Telephone (616) 459-4200
Facsimile: (248) 626-2843

June 8, 2022

Rachel Schaller
Taft Law Firm
111 East Wacker, Suite 2800
Chicago, IL 60601

**Via e-mail: rschaller@taftlaw.com**

      Re:    Cease and Desist Letter Sent to Jerry Smith

Dear Ms. Schaller:

      I am corporate counsel for U.S. Reports, Inc. d/b/a Stonemark ("Stonemark") and Jerry Smith regarding the above referenced matter. Please direct all future correspondence relating to this matter to me.

      I am in receipt of your June 2, 2022 correspondence to Mr. Smith ("Correspondence"). In the Correspondence, you ask for certain assurances. Mr. Smith responds to your request for assurances as follows.

      First, with respect to the use and disclosure of the Company's "confidential, proprietary or trade secret information," Mr. Smith is unaware that he undertook any such information. It would not seem that the materials you describe constitute trade secrets. In order to ascertain whether he will provide an assurance in this regard, I will need an exact description of each item of information he accessed or downloaded that you consider trade secrets or proprietary. I also will need information as to the methods and systems used by FIRST Insurance Funding (the "Company") to ensure only secure access to the materials you describe.

      Second, with respect to an assurance that Mr. Smith return (not destroy) any such "confidential, proprietary or trade secret information," again, he is unaware of any such material. He will be instructed not to destroy any materials.

      Third, Mr. Smith cannot provide assurances that he will not solicit business from the Company's contracts, or actual or prospective customers. Unless you can provide a written agreement barring such solicitation, or other information that may bar such competition/solicitation, we do not believe he is required to refrain from such interactions.

# KAUFMAN, PAYTON & CHAPA

*RACHEL SCHALLER*
*JUNE 8, 2022*
*PAGE 2 OF 2*

Mr. Smith and Stonemark have no intention of using any trade secrets belonging to the Company.  We will also abide by all applicable laws and agreements.  As such, if you think we are bound by any restrictions on the solicitation of clients, please provide me with those citations, and we will consider them.

Please feel free to contact me with any questions.

Very Truly Yours.

KAUFMAN, PAYTON & CHAPA

Lawrence C. Atorthy

cc:  Daniel Saeedi (dsaeedi@taftlaw.com)

EXHIBIT C

# KAUFMAN, PAYTON & CHAPA

A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELORS AT LAW
200 KAUFMAN FINANCIAL CENTER
30833 NORTHWESTERN HIGHWAY
FARMINGTON HILLS, MICHIGAN 48334-2551

(248) 626-5000
TELEFACSIMILE: (248) 626-2843
www.kaufmanlaw.com

**LAWRENCE C. ATORTHY**
*also admitted in California*
Direct Dial: (248) 626-7138
E-Mail: lcatorthy@kaufmanlaw.com

**DETROIT**
119 State Street
Detroit, MI 48226
(248) 626-5000
Facsimile: (248) 626-2843

**GRAND RAPIDS**
161 Ottawa Avenue NW, Suite 205-C
Grand Rapids, Mi 49503
Telephone (616) 459-4200
Facsimile: (248) 626-2843

August 10, 2022

Daniel R. Saeedi
Taft Stettinius & Hollister
111 East Wacker
Suite 2800
Chicago, IL 60601

**Via e-mail: dsaeedi@taftlaw.com**
**and FedEx: ((312) 840-4308)**

> Re:   **Alleged Misappropriation of Information by Jerry Smith**

Dear Mr. Shaeedi:

I am corporate counsel for Royal Premium Budget, Inc. d/b/a Stonemark ("Stonemark") and Jerry Smith regarding the above referenced matter. We are in receipt of your August 8, 2022 correspondence regarding the above-referenced matter.

Please accept this correspondence as a response to that August 8, 2022 correspondence. Also, please accept this correspondence as a demand that your client, FIRST Insurance Funding ("FIRST"), and its employees David Abernathy and Tim Wade, among other things, cease and desist from defaming Stonemark and its employees.

## Alleged Misappropriation of Information

With respect to your first bullet point of "Misappropriation," Mr. Smith explains the perceived "anomaly" as follows. There was no systematic downloading of information other than the access to data necessary to perform his duties as an Executive Vice President of Sales of sales FIRST for the territories of the Florida region for which he was responsible. As part of those duties, he was required to analyze and adjust the rates for the various agencies in reaction to the Federal Reserve rate changes that took place on March 17, 2022 and May 5, 2022, which resulted in a rate increase to the Prime Rate of 25 and 50 basis points, respectively.

In order to properly adjust each agency's buy rates, it is necessary to evaluate the volume of business written by each agency, the distribution of notes by tiers/premium size, the deviation from the base rates to the sell rates, and other intangible factors such as the internal pricing versus the amount of agency fees earned, as well as other criteria. As the adjustment to these agencies rates was the sole responsibility of each Relationship Manager, there is a lot of thought

# KAUFMAN, PAYTON & CHAPA

*DANIEL R. SAEEDI*
*AUGUST 10, 2022*
*PAGE 2 OF 7_____/*

and analysis that goes into making the correct decision. Without the proper data in hand, it is impossible to properly adjust the rates in accordance with the Federal Reserve movements.

To make the adjustments in the most expeditious manner, Mr. Smith e-mailed himself a copy of the worksheet provided to adjust and submit back to the FIRST home office. By doing so, he was able to have the detail up on one screen, while making the actual adjustment on another screen. To do otherwise would have been very time consuming. As Mr. Smith managed a significant portfolio, it was necessary to try to accomplish this task in the most efficient manner. This required him to use two screens, which, in turn, required him to send the information to himself

With regard to data analyzed for purposes other than addressed above, there was another reason for Mr. Smith to have possession of the information. When Mr. Smith was approached by Stonemark with a job offer, he approached his supervisor, David Abernathy, with full transparency, to let him know what was occurring. Given Mr. Smith's history at FIRST, he felt that it was the right thing to do. The substance of his conversation with Mr. Abernathy apparently was immediately conveyed to the company president, Mark Steenberg. Mr. Steenberg called Mr. Smith and asked him to make no final decision whether to leave FIRST until after they had had a chance to meet, face-to-face.

Mr. Steenberg told Mr. Smith that he was going to fly to Tampa to meet Mr. Smith there and that there would be new enhancements to Mr. Smith's compensation plan with FIRST. In preparation for that meeting, Mr. Smith did a deep dive into his portfolio, with the intent of knowing exactly what his book looked like; what agencies were off limits to increased compensation, which ones were possible increased comp targets, and other such questions salient to his compensation.

As it turned out, Mr. Steenberg told Mr. Smith that he was being fairly compensated and that there would be no adjustments to income other that in those rare cases where Mr. Smith was willing to charge exceedingly high rates. Ultimately, Mr. Smith decided to take the position with Stonemark.

The process of e-mailing files to personal e-mail accounts was standard practice for all of the Relationship Managers, including David Abernathy. Further, while travelling or prepping for agency meetings, it was often necessary to print out reports for those meetings. It was a customary practice to send them to personal e-mail accounts, run into a KINKO's or use a hotel business center to print these docs. The Wintrust IT department made it difficult for RM's to be on the road and perform their duties in an efficient manner.

As to the sensitivity or proprietary nature of the information, it is important to note that Mr. Smith created the programs for the various agents, excluding those designated as Nation

# KAUFMAN, PAYTON & CHAPA

Program business. This means that he developed the down payment structures, the installment availability structure, and the buy rates and sell rates. None of this data was stolen from FIRST. He created and managed that data for over 11 years. Mr. Smith had institutional knowledge. That knowledge was innate to Mr. Smith.

Your reference to Mr. Smith having data on every single agency is similarly unavailing. The majority of Mr. Smith's book was housed within the bucket of National Brokered business, e.g., Brown & Brown, Assured Partners, Acentria and Alliant, which are contractually restricted. This is relevant as these accounts are quite untouchable in his new role with Stonemark. In fact, after Mr. Smith had resigned, he contacted a number if these large accounts and requested that they stay with FIRST and his replacement Relationship Managers.

Similarly, your contention that Mr. Smith "misappropriated "[d]etailed information about every single insurance agency member of the Florida Association of Independent Agents [FAIA]. . . " is misguided. The FAIA information you reference contains no protected information and is generally available to any member of the Association.

As to the allegation that he improperly deleted folders and accompanying information, such a "fact" is of no moment.  Mr. Smith did no unusual "cleaning" of his e-mails, as he had nothing to hide. Any deleting was usual and customary, again due to IT-implemented size restrictions on Outlook mailboxes.

Finally, the allegation referencing activity on May 26th of accessing and downloading proprietary videos and materials is patently false. Mr. Smith was looking for an E-Complete video for a new agency setup, as he had expressed interest in the technology. He went into Seismic, looked around for the video and could not find it, so he exited. He did not take anything from that session. Even if he had done so, it would have been saved or downloaded to his FIRST laptop and still would be in FIRST's possession.

## Defamatory Comments, Blackmail Attempt and Harassing Conduct by FIRST Employees

Stonemark once employed Tim Wade.  Mr. Wade's employment with Stonemark ended on May 22, 2022.  He subsequently went to work for FIRST, apparently as a "Director of Management and Sales Manager."  Stonemark demanded that he return certain computer peripherals that had been lent to him to permit him to work from home during his tenure at Stonemark.  A copy of an e-mail stream between Mr. Wade and Oneil Franso (a Human Resources Vice President for Stonemark) from July 30, 2022 through August 8, 2022 is attached.

# KAUFMAN, PAYTON & CHAPA

*DANIEL R. SAEEDI*
*AUGUST 10, 2022*
*PAGE 4 OF 7 _____ /*

On August 2, 2022, Mr. Wade wrote to Mr. Franso the following (emphasis supplied):

**" David Abernathy told me how [Elizabeth Davies – Stonemark's President] illegally poached [FIRST's] workers (while they were working)? That [sic] immoral best, illegal at worse [sic]**

"And: its [sic] all on tape. I have seven copies. FIRST copy goes to first insurance funding lawyers

" Second, third, and fourth go to local news outlets

**"Pay me my severance, they never see the light of day"**

By stating to Mr. Wade that Ms. Davies "poached" FIRST's employees, Mr. Abernathy defamed Ms. Davies and Stonemark.  FIRST's employee, Mr. Wade, re-published that defamatory remark by repeating it to Mr. Franso.  In addition, by mandating to Mr. Franso that a "severance payment" be made, or incriminating tapes would be released to the public, Mr. Wade arguably committed extortion and/or blackmail.

In a subsequent e-mail dated August 8, 2022, Mr. Wade stated as follows (emphasis supplied):

"I never heard back from you regarding my one month severance, so i suppose that means ill [sic] keep all the computer equipment that you sent me empty boxes for i suppose (although with kaufman, who knows,)?

**"I sent my Stonemark polos back to the Frisco office, as a sign of good faith.**

"My one month  $3500 severance shows, ill mail back all monitors, phones, headsets, etc.  I gave Elizabeth Davies the same deal.

**"As I mentioned before, Elizabeth jas [sic] broken moral laws at best, and legal ones at worse** [sic]. She contacted staff members at FIRST insurance funding, at their office, on more than 9 occasions, offering them better pay and signing bonuses.  Since i work there now, I've heard several of the recordings that employees recorded of her. **Harassment, poaching, you name it.**

**"Im [sic] sure we'll be talking real soon, if you email or call me. Your choice. Your call. Your move."**

"Tim Wade

# KAUFMAN, PAYTON & CHAPA

*DANIEL R. SAEEDI*
*AUGUST 10, 2022*
*PAGE 5 OF 7*

"850.300.3132

**"Director of Management and Sales Manager:  FIRST Insurance Funding"**

Again, one could argue that Mr. Wade has defamed Ms. Davies and Stonemark.  By stating that she has ". . . broken moral laws at best, and legal ones at [worst]," Mr. Wade has accused Ms. Davies of illegal and immoral activities when she has not done so.  In addition, one should note that the "polos" he returned to Ms. Davies were apparently drenched in urine.  This could be considered harassment of Ms. Davies. In this August 8, 2022, Mr. Wade also renews the prior offer he made to Ms. Davies, which offer possibly constituted extortion and/or blackmail.

Perhaps most significantly, Mr. Wade closes this latest e-mail with his supposed title with FIRST.  Stonemark and Ms. Davies interpret this to mean that Mr. Wade's last e-mail was sent with FIRST's imprimatur.

Finally, we also have learned that at least one of First's employees has told agents that Stonemark is not capable of servicing the agents' business and that the agents should stay with FIRST.  This characterization is untrue and constitutes trade disparagement.

## Response to Demand and Reminder of Future Obligations

Based upon the explanation set forth above, Mr. Smith and Stonemark present the following response to your four demands.

1.      Neither Mr. Smith nor Stonemark have used any of FIRST's confidential, proprietary or trade secret information, and neither has disclosed any such information to any third-party.  Indeed, almost all of such information that ever was in Mr. Smith's possession is resident on his FIRST-issued computer, which is in FIRST's possession.

2.      Please see above response.  There is nothing to return.

3.      There is no contract, law or other obligation that Mr. Smith or Stonemark refrain from engaging in legitimate business activities that may result in the reduction in or cessation of any business relationship between FIRST and any of its contracts or actual or prospective customers, so we will not agree to this request.  If we are in error in any way, whether factually or legally, please elaborate.

4.      We will not agree to a one-year non-solicitation agreement.

# KAUFMAN, PAYTON & CHAPA

*DANIEL R. SAEEDI*
*AUGUST 10, 2022*
*PAGE 6 OF 7* _____/

## **Demand for Assurances**

Based upon the actions and words of FIRST employees, David Abernathy and Tim Wade, Stonemark and Mr. Smith demands that FIRST and its employees cease defaming or otherwise disparaging Stonemark or Mr. Smith to any third-parties, including, but not limited to, agents and trade associations. Stonemark and Mr. Smith further demand that FISRT ensure that its employee Tim Wade cease and desist from all further contact with Ms. Davies, Mr. Smith or Stonemark or its personnel except as reasonably necessary to engage in legitimate business. We also believe that, if we are to resolve these issues amicably, it would help if FIRST would provide to us copies of the tapes to which Mr. Wade refers in his e-mails. If it is FIRST's contention that such tapes do not exist, then please advise us of that fact.

Please provide a response to this correspondence by 5:00 pm (CDT) on August 16, 2022. If an answer is not received by that time, we will assume that your compliance with these demands will not come voluntarily. Under such circumstances, we will undertake any and all action to protect our interests.

Please note that any demands asserted by us in this correspondence should not be interpreted as a waiver of any other rights that may now, or in the future, be available to us.

Also, because there is a possibility of litigation, FIRST, as well as its employees Tim Wade and David Abernathy, need to be aware of the important obligation that they now have concerning locating, preserving, and being able to produce all information, including that stored in any electronic media, such as electronic mail and data stored on computer hard drives, networks, servers, and certain backup media that is, or may be, relevant to the subject matter of the litigation. Although not all of the following may apply to FIRST or Mr. Wade, courts have recently outlined these steps for complying with this obligation:

1.    Suspending all protocols that relate to the routine destruction of electronic and hard copy data that may be relevant to the litigation. This includes the overwriting and recycling of archive or backup tapes you or the company routinely use for storing and retrieving information. This is typically accomplished with the circulation of a "litigation freeze order" or "litigation hold." As a general rule, a litigation hold does not apply to inaccessible backup tapes such as those maintained solely for disaster recovery purposes.

2.    Identify all "key players" likely to be in possession of relevant hard copy and electronic information and instruct them (a) not to destroy any such information; (b) to preserve indefinitely all such information, whether stored in active or archived files, including on cell phones, PDA's, laptops, computer systems, or

# KAUFMAN, PAYTON & CHAPA

*DANIEL R. SAEEDI*
*AUGUST 10, 2022*
*PAGE 7 OF 7                    /*

networks; and (c) to place any later-created relevant information into a separate electronic file appropriately labeled.

3.   We recommend that a person be appointed who will be responsible for implementing, supervising, and enforcing these safeguards.

4.   Also, if litigation follows, the court may issue orders relating to the production of information. Full compliance with any such orders will be extremely important. It is also important that we be notified immediately if FIRST or Messrs. Wade or Abernathy become aware of any potential compliance failures, regardless of their perceived severity. Fulfilling all of these obligations will reduce the likelihood that discovery and document preservation issues will unduly impact the litigation.

Very Truly Yours.

KAUFMAN, PAYTON & CHAPA

Lawrence C. Atorthy

# JULY 30, 2022 – AUGUST 2, 2022 E-MAIL EXCHANGE



**From:** Franso, O'Neil <ofranso@hwkaufman.com>
**Sent:** Tuesday, August 2, 2022 7:02 AM
**To:** Lawrence C. Atorthy - Kaufman Law <LCAtorthy@KaufmanLaw.Com>; Tricoli, Christine M. <cmtricoli@HWKaufman.Com>
**Subject:** Fwd: Automatic reply: [EXTERNAL] Re: Stonemark

Please review the email from Tim.

O'Neil Franso
Corporate Vice President, HR
E: ofranso@hwkaufman.com
D: 248.702.1393

**From:** Tim Wade <timlwade2125@gmail.com>
**Sent:** Tuesday, August 2, 2022 5:50:25 AM
**To:** Franso, O'Neil <ofranso@hwkaufman.com>
**Subject:** Re: Automatic reply: [EXTERNAL] Re: Stonemark

I will send the monitors. NOT BECAUSE i have to, there is no contract stipulating I have to. Im just a nice guy, regardless of what "Elizabeth Davies" says. I am at first insurance funding now, and will be taking back all my agents

I WILL NOT send back the phone or the headset, nor will i send back the monitor camera.

Show me a contract, that shows I owe you all that, id be glad to send it to you.

Better yet, have Elizabeth Davies write me a letter asking for it back, and its yours. And a severance check

It will take a severance of $3500 before i entertain that letter. The fact that you offered me NO SEVERANCE, tells me all i need to know.

I changed my mind. The monitors, phone, camera, headset, and EVERYTHING ELSE for $3500.

David Abernathy told me how she illegally poached their workers (while they were working)? That immoral best, illegal at worse

And: its all on tape. I have seven copies. First copy goes to first insurance funding lawyers

 Second, third, and fourth go to local news outlets

Pay me my severance, they never see the light of day


Don't pay, her career is over

*Tim Wade*
*850.300.3132*

Feel free to call me

My signing bonus is 20k for First Insurance

Your move



On Mon, Aug 1, 2022, 5:57 PM Tim Wade <timlwade2125@gmail.com> wrote:
> Nothing in my contract shows i owe you anything. Monitors, etc. I think I will keep them.
>
> Best of luck!
>
> On Mon, Aug 1, 2022, 4:41 PM Franso, O'Neil <ofranso@hwkaufman.com> wrote:
>
> > Hi Tim;

Thanks for your email.  I dug into this with our IT department and those boxes are indeed for the company equipment in your possession (i.e. the two monitors).

Thanks for the photos; it does seem that the boxes are a bit much.  We rely on a third-party vendor for this, and I cannot speculate as to why they shipped so many boxes.  In any case, feel free to retain extra boxes and materials for personal use or feel free to discard it if you do not want it.  And, thanks in advance for understanding.

If you need anything else, do not hesitate to let me know.

Best,

**O'Neil Franso**
*Corporate Vice President*

*Human Resources*

H.W. KAUFMAN GROUP
30833 Northwestern Hwy | Farmington Hills, MI 48334
T: 248.702.1393 | V: 7.40.6220
ofranso@hwkaufman.com | https://link.edgepilot.com/s/baf4c49c/h1Ih1GcuUk_d-mF-r9ODxw?u=http://www.hwkaufman.com/

*Our priority continues to be serving our clients' needs while ensuring the health and safety of our team members, clients, and partners.  Please review the extensive actions Kaufman is taking in response to COVID-19.*

**From:** Tim Wade <timlwade2125@gmail.com>
**Sent:** Saturday, July 30, 2022 5:00 PM
**To:** Franso, O'Neil <ofranso@hwkaufman.com>
**Subject:** Re: Automatic reply: [EXTERNAL] Re: Stonemark

I received 3 very large empty boxes, along with a smaller box. Return address appears to be H W Kaufman, although im not sure ( see photo). Please advise. I have nothing to send back to you. Now, this is 3 LARGE boxes and a smaller one. If you need something from me, best practice would be to tell me what it is.

I have two of your monitors, but they'll fit in one box. Not sure why the overkill.

Best,

Tim Wade

850.300.3132

On Fri, May 20, 2022, 10:32 AM Franso, O'Neil <ofranso@hwkaufman.com> wrote:

Thank you for your email.

I am traveling until 5/25. I will do my best to check emails and reply during my travels. If it's urgent, send an email to Lindsay Nofs at lmnofs@hwkaufman.com.

This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. This information is confidential information, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering this electronic message to the intended recipient, you are notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please notify us immediately by reply e-mail or by contacting us at 248-932-9000, and destroy the original transmission and its attachments without reading them or saving them to disk or otherwise.

This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. This information is confidential information, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering this electronic message to the intended recipient, you are notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please notify us immediately by reply e-mail or by contacting us at 248-932-9000, and destroy the original transmission and its attachments without reading them or saving them to disk or otherwise.

This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. This information is confidential information, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering this electronic message to the intended recipient, you are notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please notify us immediately by reply e-mail or by contacting us at 248-932-9000, and destroy the original transmission and its attachments without reading them or saving them to disk or otherwise.

[This message was sent from outside the organization. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe. CASS Tech Security Team]

# AUGUST 8, 2022 E-MAIL



**From:** Tim Wade <timlwade2125@gmail.com>
**Sent:** Monday, August 8, 2022 8:42 PM
**To:** Franso, O'Neil <ofranso@hwkaufman.com>
**Subject:** [EXTERNAL] Severance

I never heard back from you regarding my one month severance, so i suppose that means ill keep all the computer equipment that you sent me empty boxes for i suppose (although with kaufman, who knows,)?

I sent my Stonemark polos back to the Frisco office, as a sign of good faith.

My one month  $3500 severance shows, ill mail back all monitors, phones, headsets, etc.  I gave Elizabeth Davies the same deal.

As I mentioned before, Elizabeth jas broken moral laws at best, and legal ones at worse. She contacted staff members at First insurance funding, at their office, on more than 9 occasions, offering them better pay and signing bonuses.  Since i work there now, I've heard several of the recordings that employees recorded of her. Harassment, poaching, you name it.

Im sure we'll be talking real soon, if you email or call me. Your choice. Your call. Your move.

Tim Wade
850.300.3132

Director of Management and Sales Manager:  First Insurance Funding

This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. This information is confidential information, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering this electronic message to the intended recipient, you are notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please notify us immediately by reply e-mail or by contacting us at 248-932-8000, and destroy the original transmission and its attachments without reading them or saving them to disk or otherwise.

[This message was sent from outside the organization. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe. CASS Tech Security Team]

# EXHIBIT D



Department of State   /   Division of Corporations   /   Search Records   /   Search by Entity Name   /

# Detail by Entity Name

Foreign Profit Corporation
FIRST INSURANCE FUNDING CORP.

**Filing Information**

| | |
|---|---|
| **Document Number** | P28893 |
| **FEI/EIN Number** | 36-3437365 |
| **Date Filed** | 04/09/1990 |
| **State** | IL |
| **Status** | INACTIVE |
| **Last Event** | REVOKED FOR ANNUAL REPORT |
| **Event Date Filed** | 09/28/2018 |
| **Event Effective Date** | NONE |

**Principal Address**

450 SKOKIE BLVD
SUITE 1000
NORTHBROOK, IL 60062

Changed: 05/11/2001

**Mailing Address**

PO BOX 3306
NORTHBROOK, IL 60065-3306

Changed: 04/19/2011

**Registered Agent Name & Address**

CT CORPORATION SYSTEM
1200 S. PINE ISLAND ROAD
PLANTATION, FL 33324

Name Changed: 06/22/1992

Address Changed: 06/22/1992

**Officer/Director Detail**

**Name & Address**

Title ASSISTANT SECRETARY AND DIRECTOR

DYKSTRA, DAVID A
514 SHOSHONI TRAIL
LAKE VILLA, IL 60046

Title PRESIDENT AND DIRECTOR

BURKE, FRANK J
610 ROBERT YORK AVE, APT 205
DEERFIELD, IL 60015

Title CEO & DIRECTOR

STEENBERG, MARK A
616 IRIS CT.
CRYSTAL LAKE, IL 60014

Title SVP, GENERAL COUNSEL & SECRETARY

BRASOVAN, ERYN C
311 N DERBYSHIRE AVE
ARLINGTON HEIGHTS, IL 60004

Title DIRECTOR

RADEMACHER, HOLLIS
1719 LOWELL LN
LAKE FOREST, IL 60045

Title DIRECTOR

SCHAPER, JOHN N
1842 TORREY PKWY
LIBERTYVILLE, IL 60048

Title DIRECTOR

GLABE, MARLA F
83 CARIBOU CROSSING
NORTHBROOK, IL 60062

Title DIRECTOR

NEIS, THOMAS J
7718 OAK RIDGE COURT
CRYSTAL LAKE, IL 60012

Title CEO & DIRECTOR

CANO, ALEXANDER P
72 PLYMOUTH ST
MONTCLAIR, NJ 07042

### Annual Reports

| Report Year | Filed Date |
|---|---|
| 2015 | 04/02/2015 |
| 2016 | 04/06/2016 |
| 2017 | 04/20/2017 |

### Document Images

| | |
|---|---|
| 04/20/2017 -- ANNUAL REPORT | View image in PDF format |
| 04/06/2016 -- ANNUAL REPORT | View image in PDF format |
| 04/02/2015 -- ANNUAL REPORT | View image in PDF format |
| 04/02/2014 -- ANNUAL REPORT | View image in PDF format |
| 04/12/2013 -- ANNUAL REPORT | View image in PDF format |
| 04/11/2012 -- ANNUAL REPORT | View image in PDF format |
| 04/19/2011 -- ANNUAL REPORT | View image in PDF format |
| 04/05/2010 -- ANNUAL REPORT | View image in PDF format |
| 04/02/2009 -- ANNUAL REPORT | View image in PDF format |
| 01/14/2008 -- ANNUAL REPORT | View image in PDF format |
| 04/30/2007 -- ANNUAL REPORT | View image in PDF format |
| 04/21/2006 -- ANNUAL REPORT | View image in PDF format |
| 04/28/2005 -- ANNUAL REPORT | View image in PDF format |
| 04/22/2004 -- ANNUAL REPORT | View image in PDF format |
| 05/01/2003 -- ANNUAL REPORT | View image in PDF format |
| 04/18/2002 -- ANNUAL REPORT | View image in PDF format |
| 05/11/2001 -- ANNUAL REPORT | View image in PDF format |
| 05/21/2000 -- ANNUAL REPORT | View image in PDF format |
| 04/27/1999 -- ANNUAL REPORT | View image in PDF format |
| 02/13/1998 -- Name Change | View image in PDF format |
| 01/28/1998 -- ANNUAL REPORT | View image in PDF format |
| 02/03/1997 -- ANNUAL REPORT | View image in PDF format |
| 04/24/1996 -- ANNUAL REPORT | View image in PDF format |
| 05/01/1995 -- ANNUAL REPORT | View image in PDF format |